**FIVE STAR PARKING, Allied Auto Parks, Inc., Charter Auto Parks, Inc., Grant Parking, Inc., L & R Auto Parks, Inc., and Valet Parking Service, Inc.**

v.

**PHILADELPHIA PARKING AUTHORITY.**

Civ. A. No. 86–1005.

United States District Court, E.D. Pennsylvania.

Oct. 14, 1986.

Peter Hearn, James J. Ferrelli, Sharon R. Buckingham, Philadelphia, Pa., for plaintiffs.

Charles W. Bowser, Luther L. Weaver, III, Kevin W. Gibson, Philadelphia, Pa., for Phila. Parking Authority.

Seymour I. Toll, Toll, Erby & Gough, Philadelphia, for Bank of America.

OPINION

LOUIS H. POLLAK, District Judge.

For upwards of three years—from September of 1982 to February of 1986—plaintiff Five Star Parking, a joint venture of five California corporations, operated a parking facility at the Philadelphia International Airport for defendant Philadelphia Parking Authority. Under the license agreement governing the relationship between Five Star and the Authority, Five Star was required to post an irrevocable letter of credit in the sum of $500,000 to insure the integrity of its operations. A dispute arose in the closing weeks of 1985 and the first weeks of 1986 about whether Five Star's employees were accurately receiving, recording, and remitting to the Authority the revenues accruing from the parking facility. In December of 1985, the Authority, without notice to Five Star, drew down the irrevocable letter of credit. In January of 1986, news stories appeared in which officials of the Authority were reported concerned about shortages in parking revenues, possibly because receipts were being siphoned off by Five Star personnel. In February, the Authority, assisted by Philadelphia police officers, entered on the premises of the parking facility,

taking custody of books and records. Five Star responded by initiating this diversity action. Five Star sought an injunction granting access to its books and records.[1] Five Star charged that the Authority's action in drawing down the letter of credit breached the license agreement, wherefore it sought the return of the $500,000. Five Star further alleged that the news stories were attributable to the Authority and were defamatory of and consequentially injurious to Five Star, wherefore it sought damages. An amended complaint expanded to three counts the allegations of injury flowing from the allegedly defamatory news stories.

The Authority moved to dismiss the entire complaint on Eleventh Amendment grounds. In the alternative, defendant moved to dismiss (1) the count alleging breach of the license agreement, for failure to state a claim on which relief could be granted, and (2) the tort counts, as barred by Pennsylvania's Political Subdivision Tort Claims Act, 42 Pa.C.S.A. § 8541 *et seq.*

At a hearing on March 7, 1986, this court denied defendant's motion to dismiss insofar as it was predicated on the Eleventh Amendment. The rationale was that under the criteria announced and applied by the Court of Appeals in *Urbano v. Board of Managers of New Jersey State Prisons,* 415 F.2d 247 (3d Cir.1969), *cert. denied* 397 U.S. 948, 90 S.Ct. 967, 25 L.Ed.2d 129 (1970); and *Blake v. Kline,* 612 F.2d 718 (3d Cir.1979), *cert. denied* 447 U.S. 921, 100 S.Ct. 3011, 65 L.Ed.2d 1112 (1980), the structure and functions of the Authority could not properly be characterized as partaking of the sovereignty of the Commonwealth.[2]

Treating the Authority's motion to dismiss the contract claim as a motion for summary judgment (because defendant and plaintiff both buttressed their arguments with documents *dehors* the complaint), this court denied the motion.[3]

Following the March 7 hearing, some time went by in which the parties sought to achieve a resolution of their dispute without further litigation. When these negotiations broke down, this court granted Five Star additional time for discovery prior to ruling on the Authority's outstanding motion to dismiss the tort counts.

In July, plaintiff filed a second amended complaint which repeats, but in somewhat narrower compass, the central claims of the original complaint. Four counts re-

---

1. The prayer for injunctive relief was mooted by agreements on access arrived at by the parties.

2. Defendant's contention that the authority of *Urbano* and *Blake v. Kline* had been eroded by *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), was rejected. Also rejected was the Authority's contention that "the Commonwealth Court ... has ... found the Philadelphia Parking Authority to be vested with sovereign immunity." Docket Document 10, p. 8. The Commonwealth Court has held that the Authority has *governmental* immunity, since it "merits the definition of 'local agency' found in Section 8501 of the Judicial Code, as '[a] government unit other than the Commonwealth government.'" *E–Z Parks, Inc. v. Larson,* 498 A.2d 1364 (1985), *aff'd.,* 509 Pa. 496, 503 A.2d 931, 91 Pa.Cmwlth. 600 (1986). Governmental immunity—conferred by the Pennsylvania Legislature—is of course far more limited than sovereign immunity. See note 7, *infra.*

3. The ruling was as follows (Tr., March 7, 1986, pp. 58–60):

    THE COURT: Well, I think it is common ground that the license agreement controls.

I find no disagreement that the predicate for drawing down a letter of credit is a recital of the default by the licensee....

The question which plaintiff tenders ... is whether the correspondence shows, or may be the beginning of a showing, that the defendant did not make its recital that there was a default in good faith. The defendant responds that that is a misconstruction of the letters of Mr. Bowser and Mr. Crumlish; that those letters tend to show, if they show anything, that the defendant did indeed think the licensee was in default in December, and so acted, and in that way had eliminated the difficulties....

Well, the very effectiveness of the advocacy on both sides I think shows that this is not an issue the resolution of which immediately and inescapably comes to mind. It requires thought, the parsing of the documents and the further pursuit of probabilities.

I am not prepared to say, in short, that no issue of material fact remains. That's enough for me to determine that summary judgment on Count 1 is not appropriate here today.

main: Count one recapitulates the claim that the drawing down of the letter of credit breached the license agreement. Count two sets forth the allegedly false January news stories and asserts that these caused Five Star to be unsuccessful on bids to operate parking facilities at a new Philadelphia hotel and a new Philadelphia office building. Count three realleges the facts set forth in count two and asserts that the press accounts were defamatory. Count four reasserts the alleged defamations, and also alleges the wrongful February seizure of the parking facility; these acts, allegedly leading to Five Star's failure to win the coveted bids, are said to have constituted "willful, wanton, vindictive, unprivileged and outrageous interference with Five Star's ongoing and prospective business relationships."

The Authority once again moves to dismiss the contract count as failing to state a viable claim and the tort counts as barred by Pennsylvania's Political Subdivision Tort Claims Act.

### I.

Count one—the claim that the Authority breached the license agreement by drawing down the letter of credit—seems to present the following questions: (1) Did the license agreement contemplate that the Authority could, simply by advising the Bank of America on December 18, 1985, "that Five-Star Parking did not perform according to contractual agreement dated September 1, 1982," draw down the letter of credit, without any regard for whether Five Star had in fact breached the agreement? (2) If the answer to the first question is "no," did the Authority, on December 18, 1985, have some reasonable ground for supposing that Five Star had breached the license agreement?

These questions arise from a matrix of facts and cannot be determined on summary judgment if material issues of fact remain. Such issues were plainly identifiable

in March, when I denied summary judgment on count one.[4] They remain today, and I shall therefore follow my previous ruling.

### II.

The Philadelphia Parking Authority is a "local agency" within the meaning of the Political Subdivision Tort Claims Act, 42 Pa.C.S.A. § 8541 (and see *id.* at § 8501), and hence enjoys the "governmental immunity" conferred by the Act. *E–Z Parks, Inc. v. Larson,* 91 Pa.Cmwlth. 600, 498 A.2d 1364 (1985) *aff'd.,* 509 Pa. 496, 503 A.2d 931 (1986). By way of exceptions to the broad principle of "governmental immunity," the Act expressly provides for "local agency" liability for several listed kinds of "injury to a person or property." 42 Pa.C.S.A. § 8542. Not to be found among the listed exceptions[5] are causes of action sounding in defamation, or in interference with business relationships—claims of the sort described by counts two, three, and four of Five Star's second amended complaint.

Five Star undertakes to meet this difficulty by contending that the Philadelphia Parking Authority's parking operations are conducted in a fashion not authorized by the Authority's governing statute and hence that the parking operations are not entitled to the immunity conferred by the Political Subdivision Tort Claims Act. The allegedly unauthorized aspect of the Authority's operations is that the Authority returns a profit to the City of Philadelphia instead of merely covering the various costs of its operations, as—Five Star insists—the Pennsylvania Legislature intended. The Authority acknowledges that it "is a source of *revenue* for the City" but says that "revenue is never equated to or bears a semblance to the economic meaning of the word profit." Docket Document 23, p. 7.

With the issues in this posture, it would appear that deciding whether the

---

4. See note 3, *supra.*

5. The exceptions catalogued in section 8542 relate to "Vehicle liability," "Care, custody or control of personal property," "Real property,"

"Trees, traffic controls and street lighting," "Utility service facilities," "Streets," "Sidewalks," and "Care, custody or control of animals."

Authority turns a profit, and whether making money is a bad thing for the Authority to do, would be less fruitful—and very likely more difficult—than deciding whether, assuming the Authority is profitable and shouldn't be, its claim of immunity fails. To that question I now turn.

The first leg of Five Star's argument is the decision of the late Chief Justice Stern in *Hill v. Allentown Housing Authority*, 373 Pa. 92, 95 A.2d 519 (1953). In *Hill*, the question was whether the Court of Common Pleas had been correct in concluding that the Allentown Housing Authority was not immune from suit by a tenant whose small child was injured as a result of the Authority's negligence:

> The Authority constructed and operated a housing unit known as Hannover Acres, and on premises owned by it immediately adjacent thereto it maintained a dump for the deposit of the ashes and rubbish of its tenants. The dump was quite large, constituting part of an abandoned quarry pit. It was not adequately enclosed by a fence or barrier. The rubbish deposited there consisted of paper, cartons, boxes, tin cans, bottles, glass, furniture, ashes, pieces of iron, newspapers, mattresses, sofas, bicycles, tires, broken wheels and toys; some of it was inflammable and occasionally fires raged on the dump. The children of the tenants were accustomed to play on and around it. One afternoon the minor plaintiff, then 7 years of age, was searching there for junk; his clothing caught on fire and he sustained severe burns about his body which resulted in serious permanent injury. In the present suit brought by his father against the Authority on his behalf, and in his own right, the court, sitting without a jury, found a verdict in favor of the father in the sum of $18,000 and as guardian of his minor son in the sum of $30,000.

*Id.* at 520.

Upon careful consideration of the legislation under which the Authority was established, Chief Justice Stern determined that the Authority's maintenance of a dump was not "the performance of a governmental function"—a determination which in turn operated to defeat the Authority's claim of immunity (*id.* at 520–21):

> The Housing Authorities Law of May 28, 1937 ... created Authorities for the proclaimed purpose of providing safe and sanitary dwelling accommodations for persons of low income. The powers granted to them are enumerated at great length in section 10....

> From these provisions in regard to the authorized activities of Housing Authorities it is to be noted that, while they are not forbidden to furnish to their tenants ordinary municipal facilities, they are not required to do so but may procure them by arrangement with a county, city or other municipality of the State.... Here the maintenance of the dump was not necessary to carry out the legislative mandate of providing dwelling house accommodations for persons of low income; at most it may have constituted a convenience for the tenants.

> It would seem reasonably inferable from the welter of decisions on the subject that the mere maintenance of a refuse dump, as in the present case, on land owned by a public agency, is not such an activity as constitutes the performance of a governmental function, but that, on the contrary, a municipality or other public body owning land is legally responsible for the maintenance of it in a safe condition to the same extent as any private owner.

Building upon *Hill*, Five Star goes on to point out that on a prior occasion the Pennsylvania Supreme Court determined that the Philadelphia Parking Authority was acting beyond its delegated authority and directed it to desist. *Price v. Philadelphia Parking Authority*, 422 Pa. 317, 221 A.2d 138 (1966).[6] Five Star then reasons that

---

6. Price was a taxpayer suit to enjoin the Authority from (1) leasing a public parking facility to a private developer on terms highly favorable to the lessee where the "record fails to disclose any benefit to the public of more than a limited and incidental nature," 221 A.2d at 149, and (2)

the Political Subdivision Tort Claims Act, in insulating from tort liability "any act of the local agency," 42 Pa.C.S.A. § 8541 (other than those acts which are, pursuant to section 8542, note 5, *supra*, denoted as exceptions to the grant of immunity) should be read as limiting immunity to acts which are "authorized." And since—as Five Star contends, and I have assumed *arguendo* —the Authority is not "authorized" to operate its parking facilities at a profit, it follows, in Five Star's view, that the Authority cannot claim immunity from suit on the tort claims asserted by Five Star.

The difficulties with this analysis are, in my judgment, manifold:

*First:* Five Star's argument takes as its predicate a case—*Hill*—which does not turn on a difference between governmental actions that are "authorized" and those that are not. In *Hill,* Chief Justice Stern did not hold that the Allentown Housing Authority was not "authorized" to maintain a dump adjacent to the housing facility. Rather, he said that "the maintenance of the dump was not necessary to carry out the legislative mandate of providing dwelling house accommodations for persons of low income; at most it may have constituted a convenience for the tenants." 95 A.2d at 521. As such, it fell within the category of "ordinary municipal facilities" which housing authorities "are not forbidden to furnish to their tenants ... but may procure ... by arrangement with a county, city or other municipality of the State." Wherefore, "it does not by any means follow that if [a housing authority] chooses to extend its activities by itself furnishing ancillary services instead of contracting to obtain them from other public bodies of the State it can thereby extend its tort immunity over the field of all such assumed activities by the contention that in furnishing

such services it is exercising a governmental function." *Ibid.* The overarching legal principle in *Hill* was perceived by Chief Justice Stern as "firmly established ..." The principle was that "in the case of acts of municipalities performed as functions of government delegated by the State to its agencies as public instrumentalities, there is immunity from such liability, whereas in the case of acts of municipalities performed in their proprietary or business capacity the doctrine of *respondeat superior* applies and liability exists." Notwithstanding the clarity of the principle, its application was beset with problems: "The ... difficulty ... arises in determining whether, in any given case, the activity in question is governmental or propriety in its nature." *Id.* at 520. As we shall note hereafter, the difficulty of applying the governmental function/proprietary function dichotomy was to lead to its abandonment. For the moment, however, it suffices to observe that in *Hill* the liability-incurring activity was "authorized" but "not necessary to carry out the legislative mandate," while in the case at bar the activity of the defendant Authority that plaintiff Five Star characterizes as not "authorized"—namely, making a profit—is not the activity which has allegedly harmed Five Star.

*Second: Hill,* decided in 1953, was a judicial refinement of a doctrine of governmental immunity—immunity for local governmental entities—that had been formulated by the courts of Pennsylvania, not by the Pennsylvania Legislature. The era of judge-fashioned governmental immunity came to an end twenty years later in the pioneering opinion of Justice (later to be Chief Justice) Samuel Roberts, speaking for a majority of the Pennsylvania Supreme Court, in *Ayala v. Philadelphia Board of Education,* 453 Pa. 584, 305 A.2d 877 (1973).[7] En route to total abrogation

leasing air-rights above the parking facility to the private developer without competitive bidding.

7. The Pennsylvania law of governmental immunity, attaching to local governmental entities, is to be distinguished from the Pennsylvania law of sovereign immunity, which attaches to the Commonwealth and its various direct embodiments. Finding the latter form of immunity to

have been embraced by Article I, section 11, of the Pennsylvania Constitution, the Pennsylvania Supreme Court held—by a four-to-three vote, on the same day that *Ayala, supra,* was decided— that sovereign immunity, unlike governmental immunity, was not subject to abrogation by the judicial branch of the Pennsylvania government acting alone. *Brown v. Commonwealth,* 453 Pa. 566, 305 A.2d 868 (1973). Both the Pennsylva-

of governmental immunity, Justice Roberts noted that the doctrine could not take partial refuge in the governmental function/proprietary function dichotomy—the dichotomy central to *Hill* and the cases preceding it: "... [T]he distinction between governmental and proprietary functions," he said, quoting Professor Kenneth Culp Davis, "'is one of the most unsatisfactory known to the law, for it has caused confusion not only among the various jurisdictions but almost always within each jurisdiction.'" *Id.* at 883–84. *Accord: City of Pittsburgh v. Commonwealth,* 468 Pa. 174, 360 A.2d 607, 610 n. 4 (1976).

*Third:* To fill the void left by *Ayala,* the Legislature recreated a substantial measure of governmental immunity by enacting the Political Subdivision Tort Claims Act, the statute to which Five Star would add the word "authorized." Is it probable that the Pennsylvania Supreme Court would feel as ready to reshape a *legislative* formulation of governmental immunity as, in the pre-statutory era, it was ready, in cases such as *Hill,* to reshape *judge-made* formulations of governmental immunity? The question must be answered in the negative. As the Pennsylvania Supreme Court put the matter in *Carroll v. County of York,* 496 Pa. 363, 437 A.2d 394, 396–97 (1981):

> This Court has repeatedly emphasized the fundamental distinction between the abrogation of a judicially created doctrine, as in *Ayala,* and the review, as here, of an act of the Legislature. As this Court stated in *Ayala,*
>
> > "the doctrine of governmental immunity—judicially imposed—may be judicially dismantled....: the controverted rule is not the creature of the Legis-

lature, *This Court fashioned it, and, what it put together, it can dismantle."*

To add to the Political Subdivision Tort Claims Act the word "authorized" would be no minor amendment. It is an amendment which presupposes that the Legislature intended that a court considering a tendered defense of governmental immunity would be required to conduct a mini-trial to determine whether the defendant governmental agency was acting *ultra vires.* And it is not at all apparent why the Pennsylvania Supreme Court would suppose that the Legislature would have been drawn to the proposition that torts committed in the government's name by officials acting *ultra vires* should generate governmental liability where "authorized" torts should not. The suggested distinction would appear to run counter to ordinary theories of tort liability. It seems a fair inference that the Pennsylvania Supreme Court would find that the Legislature, rather than using "authorized" *vel non* as the touchstone of immunity, eschewed such distinctions in structuring governmental immunity. (The court might also reasonably suppose that the Legislature would have looked to equitable actions like *Price, supra,* as the preferred mode of confining venturesome governmental agencies to their appointed rounds).

*Fourth:* There is a real risk that Five Star's formulation of the Political Subdivision Tort Claims Act would undermine the grant of immunity which the Legislature intended to supersede *Ayala.* In the case at bar, Five Star challenges as not "authorized" the Authority's alleged pattern of turning a profit, to the benefit of the City of Philadelphia.[8] It is not readily apparent

---

nia law of governmental immunity and the Pennsylvania law of sovereign immunity are to be distinguished from the state immunity from suit in federal courts which flows from the Eleventh Amendment. As noted above, I determined at the hearing on March 7, 1986, that the Philadelphia Parking Authority is not the Commonwealth of Pennsylvania for Eleventh Amendment purposes and hence is not immunized from this law suit by virtue of that provision.

**8.** Query whether characterizing the Authority's conduct as not "authorized" is appropriate: The Authority is plainly "authorized" to operate parking facilities; that is its primary mission. What Five Star is complaining about is the rate structure adopted by the Authority—a business practice which, if improper, may be subject to the reach of a court of equity, as in *Price, supra* (assuming a proper plaintiff: but would a taxpayer have standing to complain of a practice allegedly beneficial to the City fisc? or would a

why Five Star could not with equal logic contend that the Authority was not "authorized" to defame, or to interfere with the business relationships of others; but to impose such a characterization on the present controversy would appear to rob the Political Subdivision Tort Claims Act of any significant content—in this instance, and in other tort cases filed against other Pennsylvania governmental agencies in the future.

*Fifth:* To buttress its argument that Authority immunity from these tort claims would run counter to the purposes of the Political Subdivision Tort Claims Act, Five Star, relying on the Pennsylvania Supreme Court's opinion in *Carroll v. County of York*, 496 Pa. 363, 437 A.2d 394 (1981), notes that an important legislative concern was to provide immunity " 'in areas where risk management is totally uncertain at this time.' " *Id.* at 397. According to Five Star, a government agency engaged in business for profit "can manage its risks with respect to those profitmaking activities in the same way that its private competitors do. The Authority ... can procure insurance ... just the way that private competitors ... do." Docket Document 22, p. 22. In short, "[a]pplication of the Act's immunity to the profitmaking activities of the Authority would therefore only serve to give the Authority an unfair advantage over its market competitors without advancing any of the purposes underlying the Act." *Id.* at 25. Passing the question whether private parking garages routinely insure for defamation and related risks (as against risks of the sort excepted from immunity by 42 Pa.C.S.A. § 8542, note 5, *supra* ), it is less than clear that significant unfairness would in fact be visited on the Authority's private competitors by sustaining the Authority's defense of immunity from tort claims of the kind asserted here. The predicate, it must be recalled, of Five Star's argument that the Authority is outside the protection of the Political Subdivision Tort Claims Act is that the Authority

is acting *ultra vires* by operating parking facilities for a profit. But it seems a fair conjecture that if the Authority were to reform its rate structure in such a way as to operate on a "break even" basis, that change of business practice would have a far more detrimental effect on the Authority's competitors than the detriment now visited on those competitors by whatever differential in risk-exposure flows from the profit-making Authority's insulation from suits sounding in defamation or interference with prospective business relationships.

### III.

Five Star also contends that a construction of the Political Subdivision Tort Claims Act that grants immunity to the Authority when it is "running a private business," Plaintiff's Memorandum, *supra*, at p. 29, where no such immunity is enjoyed by its private competitors, would deny to Five Star the equal protection of the laws guaranteed by the Fourteenth Amendment. Five Star relies on two state court cases which find irrationality of constitutional dimension in patterns of state immunity law that grant immunity to one governmental agency but deny it to another when the two agencies are engaged in what, from the injured plaintiff's perspective, seem to be indistinguishable functions.[9] Such decisions are, however, inapposite here. The classification here complained of is not one under which differential legal consequences flow from similar forms of government conduct. The classification here complained of is one under which differential legal consequences flow from private conduct on the one hand and similar government conduct on the other hand. To say that it is irrational to distinguish between private conduct and government conduct is to belie centuries of Anglo-American legal experience. In some contexts, the law asks less of governments than of private actors. In other contexts, the law asks more. As

---

parking patron have a cognizable interest in a lower tariff?).

**9.** *Flax v. Kansas Turnpike Authority*, 226 Kan. 1, 596 P.2d 446 (1979) (Fourteenth Amendment); *Harvey v. Clyde Park District*, 32 Ill.2d 60, 203 N.E.2d 573 (1965) (state constitution).

the law becomes progressively more civilized, it is not uncommon for legislatures to narrow or obliterate certain of those distinctions. *See, e.g.,* Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.;* Civil Rights Act of 1964, 42 U.S.C. § 2000a *et seq.* But the question is one of prudence, not of constitutional obligation.[10]

### Conclusion

Treating defendant's motion to dismiss the second amended complaint as a motion for summary judgment, the motion will, in an accompanying order, be denied as to count one and granted as to counts two, three, and four.

### ORDER

For the reasons stated in the accompanying opinion, it is hereby ORDERED that defendant's motion to dismiss is (1) DENIED as it relates to count one of the second amended complaint, and (2) GRANTED as it relates to counts two, three, and four of the second amended complaint.

---

**10.** Equal protection challenges to the Political Subdivision Tort Claims Act have not fared well in the Pennsylvania Supreme Court (see *Carroll v. County of York,* 496 Pa. 363, 437 A.2d 394 (1981)), in the Pennsylvania Commonwealth Court (see, e.g. *Davies v. Barnes,* 94 Pa.Cmwlth. 145, 503 A.2d 93 (1986); *Gill v. County of Northampton,* 88 Pa.Cmwlth. 327, 488 A.2d 1214 (1985)), or in this court (*Damron v. Smith,* 616 F.Supp. 424 (E.D.Pa.1985) (Troutman, J.)). As the cited cases show, challenges based on the Pennsylvania Constitution's guarantee of access to the courts (Art. I, § 11) have also been uniformly rejected; but this latter contention has not been advanced in the present case.