## Jones v. City of Philadelphia

*Robert J. Sugarman,* for appellant.

*Daniel Rhynhart,* for appellee Katz.

*Michael Baughman,* for appellees PNI and Smerconish.

*Daniel Garry,* for appellees City of Philadelphia, Cuorato and Dougherty.

TERESHKO, *J.,* May 19, 2005—

## I. PROCEDURAL HISTORY

Plaintiff appeals from four separate orders of the trial court sustaining defendants' preliminary objections and dismissing plaintiff's third amended complaint with

prejudice. The orders sustaining the preliminary objections of Michael Smerconish, Sam Katz and Philadelphia Newspapers Inc. are dated October 20, 2004, while the order pertaining to the City of Philadelphia, James Cuorato and Vincent Dougherty is dated September 16, 2004.

## II. FACTUAL BACKGROUND

Plaintiff, Hanford Jones, appears to be a civil service employee,[1] with the title of Personal and Professional Services Coordinator for Philadelphia Minority Business Enterprise Council (MBEC). (Third amended complaint (TAC) at ¶52.) MBEC is a government agency charged with promoting affirmative action in government contracts with the City of Philadelphia, pursuant to Phila. Code §17-501(2). (TAC at ¶7.) Additionally, the MBEC, operating under the mayor's public order 04-03 and city ordinance 030125, is charged with ensuring that minority businesses are afforded equal access and opportunity to compete for, and secure, contracts in the City of Philadelphia. MBEC was created to "assure that public funds, sourced, administered or authorized by the City . . . are not used to promote, reinforce or perpetuate discriminatory practices." See public order 04-03. In short, the exercise of MBEC's powers involves ensuring that there is no discrimination in public contracts and in the administration of public funds.

---

1. The court uses the term because plaintiff refers to himself as a contracted, civil service employee. (Third amended complaint at ¶52.) However, plaintiff has failed to attach a copy of his employment contract to his complaint.

On April 17, 2003, plaintiff gave a presentation at an interdepartmental meeting comprised of members from the MBEC, the City Finance Department, and the City Commerce Department. (TAC at ¶11.) The purpose of this meeting was to address minority under-inclusiveness in City contracts, and to identify ways to increase City contracting opportunities for minorities. (TAC at ¶13.) During plaintiff's presentation, he included examples of recent or current bidding situations in which competitor entities had been predominantly or exclusively non-minority. (TAC at ¶17.) Plaintiff specifically chose to discuss the 151 Home Ownership Project on Cecil B. Moore Street. Plaintiff stated the problem of under-inclusiveness of minorities in this project stemmed from "Jewish firms" getting all of the contracts. (TAC at ¶18.) Particularly, plaintiff was quoted as saying that the developer teams were dominated by "Jewish architects and Jewish lawyers." [2] (TAC exhibits D, H and Q.) Various versions of this quote are pled by both parties.[3]

After the meeting, several attendees took offense to plaintiff's remarks, considering them as racial slurs and

---

2. After the fact, plaintiff was quoted by *The Philadelphia Inquirer* as saying he was a victim of a "kangaroo court": "When they get a Hitler person, those Simon Wiesenthal people make sure [the accused Nazi war criminals] at least get a chance to talk to a lawyer." (TAC exhibit D.)

3. Other attendees quoted plaintiff as saying that, "all these teams [developers] are Jews—Jew lawyers and Jew architects," while other individuals gave the version that "All of these teams are Jews—Jew lawyers and Jew architects—and we need to do something about that." (TAC exhibits H, D and Q.) However, plaintiff contends in his complaint that plaintiff stated "none of the professional-architectural candidates were ethnic minorities as all were Jewish firms." (TAC at ¶18.)

anti-Semitic. (TAC exhibit Q.) Defendant and City Commerce Department Director, James Cuorato, received several e-mails from people expressing their outrage over plaintiff's comments. (TAC exhibit C.) In an e-mail sent from the Commerce Department Director, Vincent Dougherty, who attended the presentation, to Cuorato, Dougherty described the "outrage" generated by Jones' remarks:

"I want to speak about [the] MBEC presentation and the outrage it generated among some of the attendees.

"Right now, I have a large tempest brewing regarding Hanford Jones' presentation in general, but specifically about his comments that all five of the bid/RFP responses on the Amtrak garage project had 'Jewish architects and Jewish lawyers.' This comment was made in the context that minorities are not getting contracts and/or being denied access to RFP's everywhere. While I 'gulp' at the comment, others at the meeting were extremely upset about the comments. Five of the attendees have come to me to express their outrage. (For the record, the five include women and a minority member.) One of the attendees (who happens to be half Jewish) was in tears over this following the meeting. . . .

"People are demanding a letter of apology from Hanford, as well as from Jim Roundtree and Janice Davis, on behalf of MBEC.

"This is already a 'hot potato' and getting hotter. It needs to be addressed quickly and thoroughly." (TAC exhibit Q.)

The matter was brought to the attention of plaintiff's boss, City Finance Director Janice Davis. (TAC at ¶25.) According to plaintiff, he was subjected to demotion and

reprimand. (TAC at ¶27.) The exact nature of the "reprimand," other than a letter in his personnel file, is not disclosed in the record, but, to date, plaintiff was never demoted or fired from his job as a result of his comments. (TAC exhibits D and G.) Rather plaintiff was placed on paid leave of absence, and subsequently returned to the same position he held before the controversy. (TAC exhibit G.)[4]

Approximately two months later, the controversy became a matter of frequent public discussion. (TAC at ¶¶26-27.) Both *The Philadelphia Inquirer* and the *Philadelphia Daily News* were among the media outlets that reported the controversy caused by plaintiff's remarks, and the fact that meeting attendees, as well as others, construed his remarks as anti-Semitic and ethnic slurs.

One such person was defendant Sam Katz, whom *The Philadelphia Inquirer,* in its June 4, 2003 issue, reported as opining:

"I think this raises serious questions about this administration's commitment to diversity and fairness to all. . . . Hanford Jones owes an apology, but where's the judgment of the mayor's office, that something this hateful is acceptable with a mere apology? It's frightening to think this is the way they're talking behind closed doors. Neither racism nor anti-Semitism will be tolerated in the Katz administration. He'd be gone." (TAC exhibit B.)

On June 5, 2003, *The Philadelphia Inquirer* also reported, "Republican mayoral candidate Sam Katz yes-

---

4. The exact time period of plaintiff's paid leave of absence is not disclosed in the record. But his leave of absence did not begin until June 2003—exact date is unknown.

terday condemned Mayor Street for dispensing only a late 'slap on the wrist' on a city official who displayed 'blatant anti-Semitism' in an April meeting of City Commerce Department staff. . . ." " 'I'd give him a letter all right, a letter that says, You're fired,' Katz said on Michael Smerconish's radio talk show on WPHT (1210-AM). . . ." (TAC exhibit E.)

Defendant Smerconish also characterized plaintiff's statement as an ethnic slur. The *Daily News* reported that Smerconish stated,

"[I]f you [Mayor Street] really think you are powerless then at least say this: 'My administration has zero tolerance for anti-Semitism. I wish I could fire Mr. Jones, but I am told that I lack that power. Consequently, I am publicly calling for Mr. Jones to take personal responsibility for his comments by voluntarily resigning.' " (TAC exhibit H.)

Plaintiff also alleged that Smerconish opined that plaintiff's statement was anti-Semitic, and called for his dismissal, during his radio show on WPHT (1210-AM), but plaintiff has not provided a radio transcript regarding Smerconish's comments, nor has plaintiff identified specifically any particular statement Smerconish made on the radio.

Although not named defendants in the present action, the exhibits attached to plaintiff's complaint evince that defendants Katz and Smerconish were not alone in their belief that plaintiff's remarks were anti-Semitic and deserving of discharge. Mayor John Street also condemned plaintiff's comments as violating his "standard of respect and acceptance for all people," and described plaintiff's remarks as "statements that undermine our values of

equality, respect and fairness." (TAC exhibit D.) Mark Nevins, Mayor Street's campaign spokesman, stated that Jones was "lucky he's a civil service employee because otherwise his job would be in jeopardy." (TAC exhibit E.) Burt Siegel, executive director of the Jewish Community Relations Council, described plaintiff's comments as "classic anti-Semitism." (TAC exhibit B.) Councilman David Cohen, who is Jewish, said the comment was "a classic case of anti-Semitism." (TAC exhibit D.) After almost two months since making these comments, plaintiff issued his own public apology to the attendees of his April 17, 2003 presentation, stating, "I want to ensure everyone that I am not a racist nor anti-Semitic." (TAC exhibit D.)

Plaintiff subsequently commenced this civil action against defendants by filing a complaint on April 15, 2004, alleging that defendants defamed him, as well as infringed upon various invasions of privacy rights and intentionally caused plaintiff to suffer severe emotional distress. Thereafter, plaintiff filed an amended complaint on June 1, 2004, a second amended complaint on June 6, 2004, and a third amended complaint on August 5, 2004. Defendants separately filed preliminary objections to plaintiff's third amended complaint.[5] This court granted defendants' preliminary objections separately and dismissed plaintiff's third amended complaint with prejudice.[6]

---

5. Vincent Dougherty, James Cuorato, and City filed preliminary objections on August 9, 2004; Philadelphia Newspapers Inc. filed its POs on August 23, 2004, and Sam Katz filed his POs on August 26, 2004.

6. This court granted Vincent Dougherty, James Cuorato, and City's POs on September 17, 2004. The court also granted the preliminary

Plaintiff subsequently filed his petitions for reconsideration on July 26, 2004, which this court has denied. Plaintiff has since filed his notice of appeal to the orders granting defendants' preliminary objections, and has issued his statement of matters according to Pa. R.A.P. 1925(b).

The issue in this case is whether the lower court committed an abuse of discretion or error of law in granting defendants' preliminary objections on the counts of (1) false light, (2) publicity to private life, (3) defamation, (4) intentional infliction of emotional distress, (5) tortious interference with contract, and (6) common-law malice.

## III. LEGAL ANALYSIS

Preliminary objections in the nature of a demurrer may be sustained only in cases in which it is clear and free from doubt that the facts pleaded by the plaintiff are legally insufficient to establish a right to relief. *Werner v. Zazyczny,* 545 Pa. 570, 578, 681 A.2d 1331, 1335 (1996).

### Defendants City of Philadelphia, Vince Dougherty, and James Cuorato

Preliminarily, it should be noted that governmental immunity as a defense is properly raised by preliminary objections to plaintiff's complaint. *Scott v. Willis,* 116 Pa. Commw. 327, 330-31, 543 A.2d 165, 167 (1988); *In*

POs on August 23, 2004, and Sam Katz filed his POs on August 26, 2004.

*re Upset Sale of Properties (Skibo),* 522 Pa. 230, 560 A.2d 1388 (1989).

Pennsylvania's Political Subdivision Tort Claims Act immunizes municipalities from all state tort claims except for claims falling within one of the following eight categories: (1) vehicle liability; (2) care, custody, or control of personal property; (3) real property; (4) trees, traffic controls and street lighting; (5) utility service facilities; (6) streets; (7) sidewalks; and (8) care, custody, or control of animals. 42 Pa.C.S. §§8541-42. An identical immunity applies to City employees sued in their "official capacities." *Renk v. City of Pittsburgh,* 537 Pa. 68, 73, 641 A.2d 289, 292 (1994). This immunity extends to an employee of the city who is liable for civil damages caused by acts which are within the scope of his office or duties. *Id.* An employee's immunity does not extend to acts that are judicially determined to be crimes, actual fraud, actual malice, or willful misconduct. *Id.* Accordingly, the exceptions to the tort claims Act must be narrowly construed. *Kiley by Kiley v. City of Philadelphia,* 537 Pa. 502, 506, 645 A.2d 184, 185-86 (1994).

Claims for false light, publicity to private life, intentional infliction of emotional distress, and defamation are not negligence claims and do not fall within any of the eight aforementioned exceptions to general tort immunity for the city and its officials. In fact, courts have previously found that the City is immune from actions for defamation. *Five Star Parking v. Philadelphia Parking Authority,* 662 F. Supp. 1053 (E.D. Pa. 1986). Under the Act, defendants City of Philadelphia, Cuorato and Dougherty are immune from liability for any of these claims under the Act.

## False Light Claim

Assuming arguendo, that the defendants are not immune pursuant to the Act, plaintiff fails to state a claim of false light against all defendants.

"The tort of false light—invasion of privacy is defined in the Restatement (Second) of Torts as follows:

"One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy if

"(a) the false light in which the other was placed would be highly offensive to a reasonable person and

"(b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed. Restatement (Second) of Torts §652E." *Wecht v. PG Publishing Co.,* 725 A.2d 788, 790 (Pa. Super. 1999). (footnote omitted)

In order to sustain a claim for false light, the element of publicity must be satisfied by widespread dissemination of the material. *Weinstein v. Bullick,* 827 F. Supp. 1193, 1202 (E.D. Pa. 1993). The tort of false light involves "publicity that unreasonably places the other in a false light before the public." *Strickland v. University of Scranton,* 700 A.2d 979, 987 (Pa. Super. 1997) (quoting *Curran v. Children's Service Center of Wyoming County Inc.,* 396 Pa. Super. 29, 38, 578 A.2d 8, 12 (1990)). A cause of action for invasion of privacy will be found where a major misrepresentation of a person's character, history, activities or beliefs is made that could reasonably be expected to cause a reasonable man to take seri-

ous offense. *Id.* The question whether a complaint adequately alleges falsity is a matter properly decided on preliminary objections. The Pennsylvania Supreme Court recently made this clear in *Tucker v. Philadelphia Daily News,* 577 Pa. 598, 848 A.2d 113 (2004). In *Tucker,* the court sustained preliminary objections for failing to plead adequately "actual malice." *Id.* Falsity is a prerequisite for actual malice. In order to establish actual malice, the defendant must know that a statement was false or subjectively believe that it was false. *Tucker,* 577 Pa. at 624-27, 848 A.2d at 130-32. The *Tucker* court also held that falsity must eventually be proven by clear and convincing evidence. *Id.* at 620-21, 848 A.2d at 127-28. Thus, at the pleading stage, the plaintiff must plead sufficient facts such that a jury could eventually conclude, by clear and convincing evidence, that the articles at issue are false. *Id.* at 625, 848 A.2d at 130-31. In the present case, the plaintiff failed to plead sufficient facts such that a jury could conclude by clear and convincing evidence that defendants' remarks that Jones statements were "anti-Semitic" were false.

The definition of *"anti-Semitism"* is: hostility toward or discrimination against Jews as a religious, ethnic, or racial group. Webster's Dictionary 93 (9th ed. 1989). This definition lists three ways which would constitute discrimination of Jews: by their religious affiliation, by their ethnic background and by their race. Discrimination is defined as "[t]he effect of a law or established practice that confers privileges on a certain class or that denies privileges to a certain class because of race, age, sex, nationality, religion, or handicap." Black's Law Dictionary (7th ed. 1999).

In *Liberty Lobby Inc. v. Dow Jones & Co.,* 267 U.S. App. D.C. 337, 838 F.2d 1287 (1988), the citizens' group, Liberty Lobby Inc. filed a complaint for libel, naming the publisher, *The Wall Street Journal* and author Rich Jaroslovsky as defendants. Liberty Lobby subsequently amended its complaint to add additional causes of action based on a column about libel lawsuits involving the citizens' group. The United States District Court for the District of Columbia granted defendant publisher's motions for summary judgment and judgment on the pleadings in the libel actions. *Id.* The appellate court, in affirming the district court, found that each of the citizens' group's claims was clearly barred on several common-law and constitutional grounds. The court held that statements about Liberty Lobby's publishing activities were non-actionable as a matter of federal constitutional law because no reasonable jury could have found by a fair preponderance of the evidence that these statements were false, and, because there was absolutely no evidence that any statements were made with a high degree of awareness of probable falsity. *Id.* The court also held that the relevant column was constitutionally protected as a statement of opinion. *Id.*

In adopting the district court's rationale, the appellate court stated that the truth or falsity of *The Journal's* statements concerning Liberty Lobby's publishing activities "was 'immaterial,' for, even if false, they were not 'defamatory in the least of Liberty Lobby but for the . . . characterization of the entire conglomerate as "anti-Semitic." ' " *Id.* at 1291 (citing *Liberty Lobby Inc. v. Dow Jones & Co.,* 638 F. Supp. 1149, 1152 (D.D.C. 1986)). The district court also "suspect[ed] . . . that the term 'anti-Semitic,' as Jaroslovsky has used it, is probably consti-

tutionally protected opinion." *Id.* (citing *Ollman v. Evans,* 242 U.S. App. D.C. 301, 750 F.2d 970, 974-84 (D.C. Cir. 1984) (en banc), *cert. denied,* 471 U.S. 1127, 86 L.Ed.2d 278, 105 S.Ct. 2662 (1985)). Unlike in *Liberty Lobby,* our Superior Court has definitively stated that, under Pennsylvania law, an accusation of anti-Semitism is not defamatory; rather it is a protected fundamental right to express views about the character of other people. *Rybas v. Wapner,* 311 Pa. Super. 50, 54, 457 A.2d 108, 110 (1983). In *Rybas,* the Superior Court stated that classifying the term anti-Semitic as defamatory would, "restrict too severely the right to express such opinions, no matter how annoying or disagreeable," and "would be [a] dangerous curtailment of a First Amendment Right." *Id.* at 55, 457 A.2d at 110. The court affirmed that a publication which accuses an individual of unpleasant or undesirable prejudice may offend his sensitivities, but is not thereby libelous. *Id.*

According to *Rybas* and *Liberty Lobby,* use of the term "anti-Semitic" cannot be considered defamatory, and therefore is protected speech under the First Amendment. However, even if the appellate court does not classify this term as protected opinion, plaintiff's claims must still fail because the term "anti-Semitic" is not capable of being false in this case.

In *Liberty Lobby* the appellate court further held that, to the extent the charge of anti-Semitism had any objectively verifiable factual content, the statement was substantially true and thus not actionable to claims requiring proof of falsity as an element. *Id.* at 1291.

Here, plaintiff fails to plead any specific facts that would enable a jury to find, by clear and convincing evi-

dence, that any of the articles attached to the third amended complaint were false. In his third amended complaint, plaintiff takes issue with the defendants' use of the terms "slur" and "anti-Semitic" when describing plaintiff's comments that the developer teams were dominated by "Jewish architects and Jewish lawyers." (TAC exhibits D, H and Q.) After the presentation, an e-mail from Dougherty to Cuorato indicated that several people were outraged by these remarks and sought advice on how to deal with this matter. (TAC exhibit Q.)

As stated in his complaint, plaintiff, as an employee of MBEC, was scheduled to make a presentation at an interdepartmental meeting that included members from the Commerce Department, the Procurement Department and MBEC. (TAC at ¶10.) MBEC is a governmental agency charged with ensuring that *minority businesses* are afforded equal access and opportunity to compete for and secure contracts in the City of Philadelphia and was specifically created to "assure that public funds, sourced, administered or authorized by the City . . . are not used to promote, reinforce or perpetuate *discriminatory practices.*" In short, the exercise of MBEC's powers involves ensuring that there is *no discrimination* in *public contracts* and in the administration of *public funds.*

At the meeting, plaintiff made a presentation, which included examples of recent or current bidding situations in which competitor entities had been predominantly or exclusively non-minority. (TAC at ¶17.) As an example, plaintiff chose to discuss the 151 Home Ownership Project on Cecil B. Moore Street. Plaintiff stated that the developer teams were dominated by "Jewish architects and Jewish lawyers." (TAC exhibits D, H and Q.)

Because the goal of MBEC was to ensure equal opportunity for minority businesses in contracting, the presentation of plaintiff should have focused on the discussion of how to obtain equality in public contracting and eradicate discriminatory practices. This would entail plaintiff identifying and discussing ways minorities, as a whole, can better compete for public contracts. Instead, plaintiff chose to isolate and discriminate against a minority,[7] by singling out those of Jewish background as a source of the problem. By identifying Jewish people as those receiving the responsibilities of public contracts over other minorities, plaintiff inferred that Jewish people were impeding the process of equality in public contracting. The goal of this meeting should have been to educate minorities in order to increase their competitiveness for public contracts. Instead, plaintiff chose to isolate and identify successful bidders by their racial, religious and ethnic characteristics. Since a reference to these characteristics was unnecessary to achieve the intended goal, the use of the term "Jewish architects and Jewish lawyers" could have no other purpose than to express hostility or discrimination toward this class of individuals. Under the circumstances, plaintiff is without sufficient evidence to prove that defendants' use of the term "anti-Semitic" is false. For these reasons, plaintiff will fail on all claims requiring proof of falsity listed below.

Defendants' comments in light of plaintiff's conduct are a reasonable, subjective interpretation of the meaning of plaintiff's remarks. A party cannot be held liable

---

7. It has been established that those of Jewish background comprise only 2.2 percent of the population of the United States. (U.S. Bureau of the Census, 2001.)

for forming and expressing opinions, unless the alleged behavior upon which the opinion was based did not actually occur, or the opinion was far out of proportion with the facts. *Parano v. O'Connor,* 433 Pa. Super. 570, 576, 641 A.2d 607, 610 (1994). In this case, the plaintiff's comments could have been and were, in fact, construed as "slurs" and "anti-Semitic" comments not only by the defendants, but also by several attendees of the meeting. The defendants expressed their opinions on facts and comments of plaintiff's presentation that were corroborated by plaintiff in his complaint.[8] It can hardly be said then that these corroborated facts defendants used in making these opinions were false. As stated previously in *Tucker,* without the element of falsity, an action for false light cannot survive. Therefore, plaintiff's false light claim must fail.

## Publicity to Private Life

For the same reasons as stated in the false light rationale, plaintiff's claim for publicity to private life must also fail. In addition to the analysis *supra,* plaintiff's claim must also fail because his statements were made at a public meeting and are therefore inherently public, and have no privacy interest.

The cause of action for publicity to private life, as adopted by our Supreme Court, differs from the tort of false light only in that there is no falsity requirement. According to the Restatement (Second) of Torts §652D, an action for publicity to private life involves "[o]ne who

---

8. For more elaboration on the permissible types of expression of opinion and why labeling an individual as "anti-Semitic" or a "bigot" are not defamatory, see "defamation" analysis *infra.*

gives publicity to matters concerning the private life of another, of a kind highly offensive to a reasonable man, is subject to liability to the other for invasion of his privacy." *Vogel v. W. T. Grant Co.,* 458 Pa. 124, 130, 327 A.2d 133, 136 (1974). One of the requirements of this tort is that the publicity involves a private fact. A private fact is one that has not already been made public. *Harris by Harris v. Easton Publishing Co.,* 335 Pa. Super. 141, 155, 483 A.2d 1377, 1385 (1984). Liability cannot be based upon that which the plaintiff himself leaves open to the public eye. *Id.* There is nothing "private" about MBEC or its functions, nor Jones' statements during a presentation to various City departments in an MBEC meeting. There can be no liability for publicity to private life when the requisite "publicity" consists of a defendant giving further publicity to information that is already public. *Dowling v. Philadelphia Newspapers Inc.,* 29 Phila. 135, 150 (1995), *affirmed,* 445 Pa. Super. 654, 665 A.2d 1304 (1995).

Jones has no privacy interest in statements at that meeting because the statements made at the MBEC meeting are inherently public. MBEC is a governmental agency, operating under the mayor's public order 04-03 and city ordinance 030125, charged with ensuring that minority businesses are afforded equal access and opportunity to compete for, and secure, contracts in the City of Philadelphia. MBEC was created to "assure that public funds, sourced, administered or authorized by the City . . . are not used to promote, reinforce or perpetuate discriminatory practices." See public order 04-03. In short, the exercise of MBEC's powers involves ensuring that there is no discrimination in public contracts and in the administration of public funds. In addition, this particular meet-

ing included attendees from other public service sectors such as the City Commerce Department and the Procurement Department. (TAC at ¶11.)

There are no allegations in plaintiff's third amended complaint that any defendant was the first person or entity to give publicity to the plaintiff's comments. Further, plaintiff does not even allege how or when his comments became a matter of public knowledge. Such an averment is required to sustain a claim for publicity to private life, and cannot be done in this case.

## Defamation

Plaintiff contends that he was defamed by the defendants in their discussion of his affirmative action presentation at an interdepartmental meeting: in various newspaper publications, in an interoffice e-mail circulated between two city officials and in discussion on a local talk radio station.

To prevail on a claim for defamation in Pennsylvania, the plaintiff must establish that the defendants (1) made a defamatory communication, (2) about the plaintiff, (3) that was published to a third party, (4) who understood the defamatory meaning of the communication about the plaintiff, (5) where the plaintiff suffered special harm as a result of the publication of the communication, and (6) that any privilege invoked by the defendant was abused. 42 Pa.C.S. §8343.

In this case, plaintiff does not, and cannot, allege that defendants have published any false statements of fact. Without a false statement of fact, a defamation claim cannot survive. It is a fundamental principle of federal constitutional law and Pennsylvania law that a news

article concerning a matter of public concern is not actionable unless plaintiff pleads and proves that the statements complained of in the article are false. *Philadelphia Newspapers Inc. v. Hepps,* 475 U.S. 767, 777 (1986). The federal constitution requires the plaintiff to prove falsity where the subject matter of the article involves a matter of legitimate public concern. MBEC is a public agency. MBEC's powers involve ensuring that there is no discrimination in *public contracts* and in the administration of *public funds.* Because this case involves a public agency, the actions of the agency's public employees and public contracts and funds, the actions of MBEC and its employees constitute matters of public concern. Thus, unless the plaintiff pleads and proves that the articles and e-mail he complains of are false, his claims fail as a matter of law.

The Dougherty-to-Cuorato e-mail contained the phrase "that all five of the bid/RFP responses on the Amtrak garage project had 'Jewish architects and Jewish lawyers.' " (TAC exhibit Q.) This e-mail was created as a result of plaintiff's comments during his presentation, and discussed how to resolve the outrage from those who attended the meeting. It is clear that nothing in this e-mail contained falsity (see falsity analysis *supra*).

Plaintiff also contends that Katz, Smerconish and Philadelphia Newspaper defamed him because of their use of the terms "slur" against Jews, and "anti-Semitic" to classify his statements. (TAC at ¶54.) These statements are not actionable for defamation for two reasons. First, because falsity is an element for proving defamation and none of the articles contained any false content for the reasons explained *supra* (pp. 256-262). Secondly, the

statements constitute "pure" opinion which is protected under the state and federal constitutions. Below, this court expounds upon its aforementioned expression of opinion analysis (*supra*, pp. 256-262) to include the specific law as adopted by Pennsylvania courts.

As previously stated, a mere accusation of anti-Semitism cannot be defamatory as a matter of law. *Rybas v. Wapner*, 311 Pa. Super. 50, 55, 457 A.2d 108, 110 (1983). Calling someone an anti-Semite, like calling someone a bigot, does not have a defamatory meaning. *Id.* The *Rybas* court explained, "[w]e are persuaded that . . . 'to call a person a bigot or other appropriate name descriptive of his political, racial, religious, economic or sociological philosophies gives no rise to an action for libel.' " *Id.* (quoting *Raible v. Newsweek Inc.*, 342 F. Supp. 804, 807 (W.D. Pa. 1972)). Further, the court recognized that "individuals should be able to express their views about the prejudices of others without the chilling effect of a possible lawsuit in defamation resulting from their words." *Id.*

Whether a particular statement constitutes fact or opinion is a question of law. *Braig v. Field Communications*, 310 Pa. Super. 569, 580, 456 A.2d 1366, 1372 (1983). In *Braig*, the Superior Court adopted section 566 of the Restatement (Second) of Torts which states, "A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion." The court further quoted comment b and c which state,

"There are two kinds of expressions of opinion. The simple expression of opinion, or the pure type, occurs

when the maker of the comment states the facts on which he bases his opinion of the plaintiff and then expresses a comment as to the plaintiff's conduct, qualifications or character . . . . The second kind of expression of opinion, or the mixed type, is one which, while an opinion in form or context, is apparently based on facts regarding the plaintiff or his conduct that have not been stated by the defendant or assumed to exist by the parties to the communication. Here the expression of the opinion gives rise to the inference that there are undisclosed facts that justify the forming of the opinion expressed by the defendant . . . ." *Id.* at 580, 456 A.2d at 1372-73.

The *Braig* court reiterated that "[i]f the defendant states certain non-defamatory facts concerning the plaintiff, on the basis of which he expresses a defamatory opinion, comment c to section 556 recognizes that this 'pure' expression of opinion is absolutely privileged as a result of *Gertz.*" *Id.* at 581, 456 A.2d at 1373 (citing *Gertz v. Robert Welch Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974)). Comment c, in pertinent part, states:

"The distinction between the two types of expression of opinion, as explained in comment b, therefore, becomes constitutionally significant. The requirement that a plaintiff prove that the defendant published a defamatory statement of fact about him that was false (see section 558) can be complied with by proving the publication of an expression of opinion of the mixed type, if the comment is reasonably understood as implying the assertion of existence of undisclosed facts about the plaintiff that must be defamatory in character in order to justify the opinion. *A simple expression of opinion based on disclosed or assumed non-defamatory facts is not it-*

268

*self sufficient for an action of defamation, no matter how unjustified and unreasonable this opinion may be or how derogatory it is . . . ." Id.* (emphasis added)

Katz and Smerconish were merely expressing their views via radio broadcast[9] and articles in *The Philadelphia Inquirer* and *Philadelphia Daily News* (Philadelphia Newspaper Inc.) on this issue and therefore should not be subject to the defamation claim.

In examining all the articles regarding the issue, each contain sufficient disclosure of facts on which the defendants based their comments as to the plaintiff's conduct. Each article contains a factual background of the events as well as plaintiff quoted comments which gave rise to the opinion on how the matter should be rectified. Thus, according to *Braig,* the defendants' comments were considered "pure expression" based on disclosed facts and are not actionable as defamatory because they are privileged.

Intentional Infliction of Emotional Distress

Plaintiff also asserts a claim for intentional infliction of emotional distress against Dougherty, Katz and Smerconish. Courts have been cautious to allow recovery for a claim of intentional infliction of emotional distress. *Hoy v. Angelone,* 554 Pa. 134, 151, 720 A.2d 745,

---

9. The court cannot address the issue with respect to any comments made via radio broadcast because a transcript of the broadcast has not been provided to the court. Plaintiff stated that radio transcripts were not available to them in his response to determine preliminary objections of Philadelphia Newspapers Inc. (control no. 091704 p. 8) dated October 7, 2004. To date this court has not been furnished with any transcripts to support plaintiff's allegations.

753-54 (1998). Only conduct extreme or clearly outrageous can be a basis of an intentional infliction of emotional distress claim. *Id.* Our Superior Court has emphasized the requisite degree of conduct as, "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Buczek v. First National Bank of Mifflintown,* 366 Pa. Super. 551, 558, 531 A.2d 1122, 1125 (1987). In its holding in *Hoy,* our Supreme Court propounded upon this principle by stating "recovery for the tort of intentional infliction of emotional distress [is] reserved by the courts for only the most clearly desperate and ultra extreme conduct." *Hoy* at 152, 720 A.2d at 754. Described another way, "it has not been enough that the defendant has acted with intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation that would entitle the plaintiff to punitive damages for another tort." *Id.* (citing Restatement (Second) of Torts §46, comment d; *Daughen v. Fox,* 372 Pa. Super. 405, 412, 539 A.2d 858, 861 (1988)). It is for the court to make the initial determination whether the defendant's conduct can be reasonably considered to be outrageous as to permit recovery. *Zikria v. Association of Thoracic and Cardiovascular Surgeons P.C.,* 432 Pa. Super. 248, 254, 637 A.2d 1367, 1370 (1994).

Furthermore, our Superior Court has unanimously held that a public figure "may not recover for the tort of intentional infliction of emotional distress . . . without showing . . . that the publication contains a false statement of fact which was made . . . with knowledge that

the statement was false or with reckless disregard as to whether or not it was true." *Reiter v. Manna,* 436 Pa. Super. 192, 200-201, 647 A.2d 562, 567 (1994) (citing *Hustler Magazine Inc. v. Falwell,* 485 U.S. 46, 56, 108 S.Ct. 876, 882, 99 L.Ed.2d 41 (1988)).

Plaintiff is a public official of MBEC because MBEC is a department of the City of Philadelphia. (TAC at ¶7.) A person who has substantial responsibility for, or control over, conduct of governmental affairs, or who holds a position with such apparent importance that the public has an independent interest in the qualifications and performances of the person who holds it, beyond general public interest in the qualifications and performance of all governmental employees, may be considered a "public figure" or "public official" under the First Amendment for purposes of libel action. *Rosenblatt v. Baer,* 383 U.S. 75, 85, 86 S.Ct. 669, 675, 15 L.Ed.2d 597 (1966); U.S.C. Coast. Amend. I. The privilege is afforded to citizens only if those statements relate to the official duties of the public official in that capacity. *Rosenblatt,* 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597. Since public officials and public figures usually enjoy significantly greater access to the media, they have a better opportunity to deny the alleged defamatory statements than do private individuals. *Gertz,* 418 U.S. at 344, 94 S.Ct. at 3009. Similarly, where a plaintiff thrusts himself into the public eye in an effort to respond to allegedly defamatory allegations, she becomes a public figure for the purpose of that controversy. *Chuy v. Philadelphia Eagles Football Club,* 431 F. Supp. 254, 267 (E.D. Pa. 1977). Thus, plaintiff would also be considered a public official because, in addition to being a public official of

MBEC,[10] Jones also made himself available for interviews from news media after the incident occurred.[11] Having found that plaintiff is a public official, he could not maintain an action for intentional infliction of emotional distress for the same reason he cannot maintain claims for false light, publicity to private life or defamation—in that he cannot prove that any of the publications contained false statements.

Thus, under the case law, plaintiff's claims for intentional infliction of emotional distress must fail on two counts. Based on the comments of Katz and Smerconish and the e-mail of Dougherty, none of their statements arise to the level of statements "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society" as to warrant a claim for intentional infliction of emotional distress. *Buczek,* 366 Pa. Super. at 558, 531 A.2d at 1125. The statements made by the individuals, as stated in the defamation analysis, were pure expressions of opinion based on facts disclosed to the public at large and could hardly arise to the outrageous character needed to sustain a cause of action for intentional infliction of emotional distress. Finally, the statements made by defendants failed to contain any false statements, and were therefore true. Thus, any emotional distress suffered by plaintiff arose from his own conduct, as did the public

---

10. (TAC at ¶7.)

11. (See *Philadelphia Daily News* article dated June 4, 2003, titled " 'Jewish' remark nets him reprimand"; *Philadelphia Daily News* article dated June 5, 2003, titled "Very Loose Talk"; and *Philadelphia Inquirer* article dated June 5, 2003, "Street condemns official's remarks").

outrage generated by his insensitive and highly offensive comments.

## Tortious Interference With Contract

Plaintiff claims that Philadelphia Newspaper, Katz and Smerconish were liable for tortious interference with contract. For several reasons this claim cannot be sustained. To plead a tortious interference with contract, plaintiff must prove: "(1) the existence of a contractual, or prospective contractual relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct." *Strickland v. University of Scranton,* 700 A.2d 979, 985 (Pa. Super. 1997).

To prove tortious interference with contract requires the same element as breach of contract cases—the existence of a contract. *Williams v. Nationwide Mutual Insurance Co.,* 750 A.2d 881, 884 (Pa. Super. 2000). In *Presbyterian Medical Center v. Budd,* 832 A.2d 1066 (Pa. Super. 2003), our Superior Court affirmed the trial court's granting of preliminary objections to a breach of contract claim where plaintiff's complaint did not indicate whether the alleged contract is written, does not attach a copy of any written contract, and does not explain why a written contract could not be obtained in accordance with Pa.R.C.P. 1019(i). Thus, in order to prove that a contract existed in a case, plaintiff must attach a copy of the contract to the complaint. The plaintiff has failed to attach any contract

to his complaint, nor has he made any effort to verify the claim that he has an employment contract with MBEC. Therefore, plaintiff has failed to prove the "existence of a contract" element of a tortious interference with contract claim and cannot recover in this case.

The tortious interference claim must also fail because, as discussed above, defendants' conduct was privileged. In *Neish v. Beaver Newspapers Inc.,* 398 Pa. Super. 588, 599, 581 A.2d 619, 625 (1990), as here, the plaintiff sought to supplement his defamation action with a claim that the defendants had tortiously interfered with his contract with the borough for which he worked when they published an editorial calling for plaintiff to be fired. The Superior Court found that the editorial discourse about the plaintiff was the expression of an "opinion" by the editor of the newspaper. *Id.* at 597 n.2, 581 A.2d at 624 n.2. The editorial does not imply an allegation of undisclosed defamatory facts as the basis for the opinion. *Id.* (citing Restatement (Second) of Torts §566). The court held that such a claim failed because the defendant's conduct was privileged. This same rationale has been adopted by this court in its ruling of plaintiff's defamation claim and therefore would preclude an assertion for tortious interference with contract based on the same reasoning as stated in *Neish.*

Lastly, plaintiff has failed to prove that he suffered any actual damages as a result of defendants' comments. The Restatement (Second) of Torts defines "actual damages" for interference with a contract as follows, at section 774A:

"(1) One who is liable to another for interference with a contract or prospective contractual relation is liable for damages for

"(a) the pecuniary loss of the benefits of the contract or the prospective relation;

"(b) consequential losses for which the interference is a legal cause; and

"(c) emotional distress or actual harm to reputation, if they are reasonably to be expected to result from the interference. . . ." *Pelagatti v. Cohen,* 370 Pa. Super. 422, 435, 536 A.2d 1337, 1343-44 (1987).

The *Pelagatti* court, in sustaining preliminary objections to a claim for interference with contractual relations, held that in "absence of pecuniary loss, an action for interference with contract brought for the purpose of recouping damages for loss of reputation only, would be nothing more than a defamation action under a different caption." *Pelagatti,* 370 Pa. Super. at 436, 536 A.2d at 1343-44. In further clarifying a plaintiff's entitlement to recovery of damages for interference with contractual relations, the Superior Court in *Shiner v. Moriarty,* 706 A.2d 1228, 1239 (Pa. Super. 1998), criticized an earlier ruling in *Pawlowski v. Smorto,* 403 Pa. Super. 71, 588 A.2d 36 (1991), where the court stated that emotional damages alone are sufficient to establish the final element of this tort. Specifically, the *Shiner* court held that to hold that emotional damages alone are sufficient, *"is inconsistent with the holding in* Pelagatti *that, though non-pecuniary harms are recoverable in an intentional interference action, such an action cannot be maintained in the absence of pecuniary loss flowing from the interference."* Shiner, 706 A.2d at 1239. (emphasis added)

In his complaint, plaintiff states that he was reprimanded and demoted by the mayor for his comments. (TAC at ¶27.) In the same allegation of his complaint,

plaintiff cites to a June 2003 article from *The Philadelphia Inquirer* (TAC exhibit G) in support of this proposition. (TAC at ¶27.) However, the article has mayoral spokeswoman, Barbara Grant, stating that plaintiff was on a paid leave of absence. (TAC exhibit G ¶1.) To date, plaintiff still remains employed at the same position that he was on the date of the incident, Personal Service Coordinator of the Public Works Unit. (TAC at ¶27, exhibit G.) Thus, plaintiff has failed to show that he has suffered any pecuniary loss required to satisfy the actual legal damage element necessary to sustain a claim of interference with contractual relations.

## Common-Law Malice

Finally, plaintiff asserts a claim for "common-law malice." Although malice is an element in proving the plaintiff's aforementioned claims, malice, in and of itself is not a recognized cause of action in Pennsylvania. Thus, this cause of action was properly dismissed.

## IV. CONCLUSION

For all the aforementioned reasons, the court did not commit an error of law or abuse its discretion in granting defendants' preliminary objections to plaintiff's third amended complaint. Thus, this court respectfully requests that the orders of September 16, 2004, and October 20, 2004, be affirmed.