581 A.2d 619

**Clarence D. NEISH, Appellant,**

**v.**

**BEAVER NEWSPAPERS, INC., Trading as the Beaver County Times, a Corporation, and Leonard R. Brown, Rena A. Papale and Eugene G. Tabacchi, Individuals, Appellees.**

Superior Court of Pennsylvania.

Argued Aug. 22, 1990.

Filed Oct. 15, 1990.

Thomas W. Minett, Asst. Dist. Atty., Ellwood City, for appellant.

Scott E. Henderson, Pittsburgh, for appellees.

Before POPOVICH, JOHNSON and HESTER, JJ.

POPOVICH, Judge:

This case involves an appeal from the order of the Court of Common Pleas of Beaver County granting the Appellees'[1] motion for summary judgment against the Appellant, Clarence D. Neish. We affirm.

A review of the motion for summary judgment is governed by Pa.R.Civ.P. 1035 which, in pertinent part, provides:

> ... The judgment sought shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Additionally, in reviewing a motion for summary judgment, the Court must view the evidence in a light most favorable to the non-moving party. *Curran v. Philadelphia Newspapers, Inc.*, 497 Pa. 163, 439 A.2d 652 (1982). And, lastly, summary judgment is to be granted only in the clearest of cases, where the right is clear and free from doubt. *Kotwaskiski v. Rasner*, 436 Pa. 32, 258 A.2d 865 (1969).

---

1. The Appellees, named in the Appellant's suit, include Beaver Newspaper, Inc., t/a the *Beaver County Times,* its executive editor (Leonard B. Brown), a reporter (Rena A. Papale) and the editorial page editor (Eugene G. Tabacchi).

During a nine-week period in 1984, the *Beaver County Times* published five news articles and an editorial containing, according to the Appellant, "false statements and passages directed at him that he alleges to be capable of defamatory meaning and that [the Appellees] invaded his privacy by placing him in a false light, all of which forced him to resign his solicitorship [for the borough of Aliquippa]." (See Appellant's Brief at 6).

More particularly, the Appellant filed a five-count complaint alleging defamation (Count I), invasion of privacy—false light (Count II) and interference with a contract with a third party (Count III). Counts IV and V, having been removed from our consideration by the Appellant, need not be discussed in recounting the facts necessary to our ruling.

After the presentment of amendments, answers and submission to discovery, the Appellees filed a motion for summary judgment. The motion was granted and is challenged on appeal on four grounds, the first two of which are similar in that each claims that the trial court erred in determining that the complained-of publications were incapable of a defamatory meaning.

As written quite aptly by the trial court:

Under Pennsylvania law, "a communication is defamatory if it tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." Restatement (Second) of Torts § 559 (1977); *Wecht v. PG Publishing Company,* 353 Pa.Super. 493, 510 A.2d 769 (1986). In bringing an action for defamation, the plaintiff must first prove "[t]he defamatory character of the communication." 42 Pa.C.S. § 8343(a)(1). It is for the court in the first instance to determine, as a matter of law, whether the challenged publication is capable of a defamatory meaning. *Thomas Merton Center v. Rockwell International Corporation,* 497 Pa. 460, 442 A.2d 213 (1981). "If the court determines that the challenged publication is not capable of a defamatory meaning, there is no basis for the matter to proceed to trial." *Merton,*

497 Pa. 464–4[6]5 [442 A.2d 213]. See also *Sarkees v. Warner–West Corporation*, 349 Pa. 365, 37 A.2d 544 (1944); *Kernick v. Dardanell Press*, 428 Pa. 288, 236 A.2d 191 (1967); *Agriss v. Roadway Express, Inc.*, 334 Pa.Super. 295, 483 A.2d 456 (1984). Finally, "[i]f the publication complained of is not in fact libelous, it cannot be made so by an innuendo which puts an unfair and forced construction on the interpretation of the publication." *Sarkees*, Supra 349 Pa. at 369, 37 A.2d at 546, cited and followed in *Bogash v. Elkins*, 405 Pa. 437, 176 A.2d 677 (1962).

(Trial Court Opinion at 3) Within such a framework, we have examined the five articles and one editorial claimed by the Appellant to be defamatory. We are in agreement with the trial court's legal conclusion that the publications, although "annoying or embarrassing", are not libelous. To hold so would require, as mentioned by the trial court, an "extraordinary leap of logic".

To explicate, the September 25, 1984, story, "Aliquippa rehires Neish as solicitor", disclosed how the Aliquippa council came to "appoint[ing]", by a vote of 4–3, Neish as solicitor for the remainder of the year. The article discussed the views of the dissenting members of council to the Appellant's appointment, those who "urged the merits of retaining Neish" and how the Appellant "served as co-solicitor at no charge."

The second story was printed on September 27, 1984, and had the caption: "New Aliquippa ordinances waiting for some action". In the body of the article was discussed the status of two local ordinances, the implementation of which was unknown by council. The question over the enforcement of such ordinances was attributed to the resignation of the borough solicitor and hiring of the Appellant only three days before that day's meeting.

It was mentioned in the September 27th story how the Appellant had told a member of council his belief that ordinances were already in place covering the subject of which inquiry was being made by council. Yet, it was noted

that the Appellant's absence from the meeting prevented a resolution of the discussion.

In a report dated October 16, 1984, the *Times* printed that the Appellant had notified Aliquippa council that, in order to avoid being "fair game for the *Times*", he would render his opinions in writing and deal with residents' questions privately after council meetings to "protect himself from being misquoted." This was in letter form, which also recounted to council how the Appellant had contacted the executive editor of the *Times* to print corrections on matters concerning him. The *Times* refused to do so. Further, the *Times* reproduced, in its entirety, the letter written to the executive editor listing the alleged erroneous items printed and the corresponding true version of what transpired.

In a fourth article, dated November 28, 1984, and bearing the legion: "Charge of illegality raised in Aliquippa", it was written how the mayor challenged the council's appointment of a particular firm as auditor without having a two-third's majority vote as mandated by the borough code. It was reported further that the Appellant was not present at the meeting. However, it was recounted that "a colleague sitting in for" the Appellant indicated speaking with Neish on this subject and being advised that the appointment was proper as premised upon various sections of the borough code. The article continued by remarking that the appellant had not advised the mayor to the contrary in a phone conversation, and, in fact, had written a legal opinion supportive of such an appointment. This opinion had been read by council. As a result, the question of the auditing firm's retention was brought to a close by the president of council, who indicated he was satisfied with the answer given.

The last news article in question was dated November 30, 1984, and was captioned: "Aliquippa implements loitering, drinking laws". The by-line read: "Rena A. Papale", the staff member who had written the previous articles for the *Times*. She recounted how council decided to remove an attorney from a lawsuit concerning the water authority and retaining Attorney Tom Minnett instead. Minnett "sat in

on the meeting in the absence" of the Appellant. This caused one member of council to state her displeasure with the Appellant's absence and his failure to appear at a public meeting of council since his appointment. As a result, she recommended his removal. Appellant, by a vote of 4–3, was retained as solicitor.

The final complained-of article appeared in the October 18, 1984, edition of the *Times* in the "Our Opinion" section under the verbiage: "Public service must be open". The editorial gave the newspaper's view of the Appellant's advice to borough council that "he would not attend private council caucus sessions nor offer verbal legal opinions at public meetings." The newspaper questioned whether the people of Aliquippa were being "short-chang[ed]" if council would agree to the Appellant's terms of employment. Also, it was written that council should replace the Appellant with someone who would "answer their questions where and when they [we]re asked."

The Appellant's proposal to council was characterized as "thumb[ing] his nose" at council.

It is beyond peradventure that it is the trial court's responsibility to determine, in the first instance, whether a publication is capable of a defamatory meaning. If such not be the case, then "there is no reason for the matter to proceed to trial." *Salerno v. Philadelphia Newspapers*, 377 Pa.Super. 83, 90, 546 A.2d 1168, 1171 (1988) (Citations omitted).

In determining whether a newspaper article is defamatory, "the trial court must decide whether it can reasonably be construed to have the libelous meaning ascribed to it by the complaining party." *Zartman v. Lehigh County Humane Society*, 333 Pa.Super. 245, 250–51, 482 A.2d 266, 269 (1984) (Citations omitted). Our Supreme Court has explained:

The test is the effect the article is fairly calculated to produce, the impression it would naturally engender, in the minds of the average persons among whom it is intended to circulate. The words must be given by

judges and juries the same significance that other people are likely to attribute to them.

*Corabi v. Curtis Publishing Co.,* 441 Pa. 432, 273 A.2d 899, 907 (1971) (Citation omitted); see also *Sprague v. Walter,* 357 Pa.Super. 570, 516 A.2d 706 (1986).

█ With the foregoing in mind, we find that the newspaper articles and editorial are not capable of defamatory meaning. For example, the September 25th article merely gave an accounting of the Appellant's hiring by council as solicitor for the borough of Aliquippa, the discussion that ensued prior to his appointment and the divergent views of council members (one pro, one con) with respect to the merits of retaining Neish.

The September 27th story, relating the uncertainty that pervaded council as to the effectuation of loitering and open bag ordinances, is no more defamatory than the initial article.

We fail to discern how reference to the solicitor's absence from a council meeting, and the mentioning of a member of council being advised by Neish that he "believe[d] an ordinance already exist[ed] covering those laws" at issue, can be construed as defamatory.

The third article, dated October 16th, not only attributed the Appellant with intentions of refraining from engaging in private caucus meetings and refusing to offer verbal legal opinions, but council's agreement to such terms as a condition to retaining the Appellant as solicitor also was reported as passing by a 4–3 vote.

Likewise, the October 16th report reproduced a letter written by the Appellant to the newspaper reconstructing what he considered to be an accurate account of what took place at a council meeting, which version was at odds with previous reports on the topic of the Appellant's solicitorship.

As for the November 28th story of alleged "illegality" in Aliquippa, it merely pointed out the mayor's belief that council's appointment of an auditing firm had been done

inconsistent with the borough's code. The only reason the Appellant's name was mentioned was in the context of assigning to him the statement that there had been no violation of the borough's code in securing the auditing services.

Just as innocuous is the November 30th story appearing in the *Times*, which attributed a member of council with being "irked" over the Appellant's absence from meetings and billing the borough for services beyond the amount paid to him as a salary. For this, a motion was made and defeated to have the Appellant removed as solicitor, and the president of council came to the appellant's defense by saying that "the bill was to cover the transition period between solicitors, and that he [was] satisfied with the service the borough was being provided."

We find no evidence in any of the stories reported linking them to a defamation of the Appellant's character. Moreover, the accounts were of events which transpired at a forum open to the public. "As such, the publication[s] by the newspaper satisfied concerns of informing the public and prompting discussion of governmental affairs which the First Amendment was written to protect." *Larsen v. Philadelphia Newspapers, Inc.*, 375 Pa.Super. 66, 72, 543 A.2d 1181, 1185 (1988), allocatur denied.

The last of the articles appeared in the "Opinion" portion of the newspaper as an "editorial" questioning the Appellant's insistence in discharging his duties as solicitor only in written form to minimize the likelihood of being misquoted in the newspaper. A continuation of this proposed practice was considered not to be in the public's best interest, and the author suggested that the Appellant reconsider such a posture or be replaced by council.

The editorial, although containing statements and attributing conduct to the Appellant which might be viewed as annoying and embarrassing, is not tantamount to defamation. It was, instead, the presentment of a position by the newspaper, premised upon the Appellant's posturing to avoid negative publicity.

The Appellant, himself a public figure, should be cognizant of the scrutiny given to officials by the news media. Merely because an official is not pleased with the reporting done by a newspaper or because he might become the object of editorial discussion does not entitle him to assail the printed word under the guise of defamation.[2]  See *Salerno,* supra; see also *Larsen,* supra.

The remaining two issues to be addressed were not discussed by the trial court in its opinion to us.  Nonetheless, to avoid a needless remand for a supplementation of the court's opinion, we find that the record is sufficiently complete to afford us the opportunity to respond to the last two claims of the Appellant.

■ In the second protestation by the Appellant, he alleges court error in sustaining the Appellees' summary judgment motion to Count II (Invasion of Right of Privacy: False Light).

It is beyond question that the tort of invasion of privacy does exist in this Commonwealth.  See *Vogel v. W.T. Grant Co.,* 458 Pa. 124, 327 A.2d 133 (1974).  As stated on this cause of action by the en banc Court in *Larsen,* supra,

> ... Superior Court has adopted the definition of the tort of invasion of privacy promulgated by the Restatement (Second) of Torts §§ 652B–E.  Moreover, it has been observed that the cause of action for invasion of privacy is actually comprised of four analytically distinct torts: 1) intrusion upon seclusion, 2) appropriation of name or likeness, 3) publicity given to private life, and 4) publicity placing a person in false light.

> \*      \*      \*      \*      \*      \*

Under Section 652E of the Restatement (Second) of Torts, the tort is defined as follows:

**2.**  We find that the editorial discourse about the Appellant was the expression of an "opinion" by the editor of the *Times.*  The editorial does not imply an allegation of undisclosed defamatory facts as the basis for the opinion.  Restatement (Second) of Torts, § 566.  Consequently, the writing is not actionable as defaming the Appellant.  See *Veno v. Meredith,* 357 Pa.Super. 85, 515 A.2d 571 (1986).

One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if

(a) the false light in which the other was placed would be highly offensive to a reasonable person, and

(b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

As is so clearly stated in Section 652E, a publication is actionable if it is not true, is highly offensive to a reasonable person and is publicized with knowledge or in reckless disregard of its falsity. See Comments *a, c & d*. Further, to constitute a tortious invasion of privacy an act (publication) must " 'cause mental suffering, shame or humiliation to a person of ordinary sensibilities.' "

375 Pa.Super. at 81–82, 543 A.2d at 1188 (Citations omitted).

■ We do not find, from our reading of the record, that the Appellant has established that he has been placed in a false light by the Appellees or that the publications would have been highly offensive to a reasonable person. Compare *Martin v. Municipal Publications*, 510 F.Supp. 255 (E.D.Pa.1981). Additionally, the Appellant's stature in the community as a public figure resulted in a relinquishment of insulation from scrutiny of his public affairs. See *Harris by Harris v. Easton Publication Co.* 335 Pa.Super. 141, 483 A.2d 1377 (1984); *Aquino v. Bulletin Co.*, 190 Pa.Super. 528, 154 A.2d 422 (1959); *Hull v. Curtis Publishing Co.*, 182 Pa.Super. 86, 125 A.2d 644 (1956). Given such a scenario, the newspaper's account of what transpired at Aliquippa council meetings was to be expected and does not expose the newspaper to the allegations of "false light" charges by the Appellant.

The final assertion of the Appellant concerns the contention that the Appellees interfered with his contract of employment with the Aliquippa council as its solicitor.

■ To establish a claim of intentional interference with a contract, one needs to prove: (1) the existence of a contractual relationship; (2) an intent on the part of the Defendants to harm the Plaintiff by interfering with those contractual relations; (3) absence of privilege or justification for the interference; and (4) damages. *R.P. Russo Contractors & Engineers, Inc. v. C.J. Pettinato Realty & Development, Inc.*, 334 Pa.Super. 72, 482 A.2d 1086 (1984).

■ We find the remarks made by the Appellees in their brief to us at pages 51 and 52 to be an accurate response to the issue raised; to-wit:

First, the *Times'* conduct in reporting and commenting on the actions of a public figure was privileged. Second, even if Neish could establish the lack of privilege or justification, Neish had the burden to prove that the *Times* proximately caused the termination of his contractual relationship with Aliquippa. By Neish's own admission, municipal solicitors are frequently terminated and it would not be unusual for Neish to be "out of a job again." (Neish Dep. at 140–41, S.R. 127b–128b). In fact, Neish resigned from Council, thus terminating his contractual relationship himself. (Neish Dep. at 33, S.R. 33b). The editorial did not tell Council anything it did not already know from Neish's own conduct. Neish has not proffered any evidence that the *Times* had any contact with Council except for its publication of an editorial. Permitting a claim such as Neish's would have an impermissible chilling effect on the First Amendment rights of a newspaper to comment on issues of public concern.

We would echo the sentiments of the Appellees in that they had the right to publish what occurred at the council meetings. It did so in this instance, and there was no justification to permit this lawsuit to be tried before a jury given the evidence of record supportive of the grant of the motion for summary judgment.

Order affirmed.