**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| JOHN J. DOUGHERTY, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| PHILADELPHIA NEWSPAPERS, L.L.C., HAROLD JACKSON, PAUL DAVIS, DAVID BOYER, RUSSELL COOKE, MELANIE BURNEY, TONY AUTH, AND MONICA YANT KINNEY, | |
| Appellee | No. 1635 EDA 2014 |

Appeal from the Order Entered April 28, 2014
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s): March Term, 2009 No. 004790

BEFORE:  GANTMAN, P.J., BOWES, AND STABILE, JJ.

MEMORANDUM BY BOWES, J.:                    **FILED OCTOBER 14, 2015**

John J. Dougherty appeals from the April 28, 2014 order granting summary judgment to the defendants in this defamation lawsuit.  We affirm.

On March 30, 2009, Dougherty instituted this action against Philadelphia Newspapers, L.L.C. and seven of its employees (the "Newspaper") based upon articles published in the Philadelphia Inquirer, which was owned by Philadelphia Newspapers, L.L.C.  Dougherty averred that three articles, two of which were published on April 13, 2008, and one of which was published on April 17, 2008, were defamatory.

The facts leading up to this lawsuit are set forth below.  In 2007, former State Senator Vincent J. Fumo of Philadelphia resigned his seat in the

Pennsylvania Senate, First Senatorial District, which was based in Philadelphia. In early March, 2008, Dougherty announced his candidacy for the Democratic Party's nomination for the seat vacated by Senator Fumo. Dougherty was the business manager of the International Brotherhood of Electrical Workers Local 98, Chairman of the Board of the Philadelphia Redevelopment Authority, President of the Philadelphia Mechanical Trades Council, Vice President of the Philadelphia Building Trades Council, Vice President of the Philadelphia AFL-CIO, Board Member of Independence Blue Cross, Board Member of the Penn's Landing Corporation, President of the Pennsport Civic Association, and a Commissioner of the Delaware River Port Authority.

The Newspaper published articles about various candidates, including Dougherty. The first article involved in this defamation suit was an editorial appearing in print and online on April 13, 2008, with the headline, "For First District State Senate Choose Farnese." It stated:

> Perhaps nobody can do for Philadelphia what retiring state Sen. Vincent J. Fumo did for this city when he was at his best. But what's scary about the three-candidate race in the Democratic primary to replace Fumo is that union official John Dougherty appears fully capable of matching the incumbent at his indictable worst.
>
> The powerful Fumo is retiring after 30 years in Harrisburg, and faces a federal corruption trial in the fall. His withdrawal created an open seat to represent the city's First Senate District, which stretches from South Philly to Center City to the lower Northeast.

Dougherty, 47, business manager of Local 98 of the International Brotherhood of Electrical Workers, leads this race - in recent polls, and in denials.

He denies sending goons to intimidate people whenever it suits his union's interests. He denies accepting valuable favors from a lifelong friend and union colleague, as outlined in a federal criminal indictment against the friend. He denies that the feds found anything incriminating when they searched his home. He denies that his petulant two-day labor walkout at the Pennsylvania Convention Center in 2004 hurt the city's ability to attract business. He denies that his leadership has thwarted minorities from gaining high-paying union jobs.

With the current state senator headed for trial, Philadelphia can't afford to send Dougherty to Harrisburg. And the candidate with the best chance of defeating the mercurial, influential labor leader in the Democratic primary is LARRY FARNESE.

[At this point, the editorial article discusses Mr. Farnese and another candidate for the seat, Anne Dicker, for five paragraphs.]

With the district's overwhelming Democratic edge in voter registration, this primary is likely to decide the next state senator. Dougherty would be a poor choice, beholden to the union first and the district whenever it didn't conflict with his labor interests. In the anything-goes atmosphere of Harrisburg, it is difficult if not impossible to envision Dougherty staying out of the wrong headlines.

For those reasons, the Inquirer endorses Farnese for state Senate.

Complaint, 3/23/11, at Exhibit A.

Dougherty averred in his complaint that this article was defamatory because it stated as a fact or implied that Dougherty "had previously engaged in and/or if elected to the Pennsylvania Senate would continue to

engage in criminal conduct on a scale at least equal to that outlined in the indictment against former Senator Fumo." *Id*. at ¶ 20.

On the same day, April 13, 2008, an article was published in the paper and online, entitled "Dubious Judgment It's Dougherty's gift," and it read:

> Say you're a powerful union boss who chairs the city's Redevelopment Authority, serves as a Delaware River Port Authority commissioner, presides over a South Philadelphia waterfront neighborhood group, and dreams of being mayor or, for now, state senator.
>
> It's 2005. You earn $175,000 that year and decide to renovate your home.
>
> Do you (a) rent a place for the duration of the messy six-month project or (b) live for free at a luxury waterfront apartment building owned by a prominent developer?
>
> John Dougherty chose b.
>
> Personally, if I wore as many hats as Dougherty does and wanted to hold office, I'd jump into the Delaware before taking a gift like that.
>
> Dougherty, business manager for Local 98 of the International Brotherhood of Electrical Workers and Democratic candidate for the First District's state Senate seat, seems to have no problem with sweet deals that to voters may taste sour.
>
> In 2003, according to federal authorities, he bought a North Wildwood condo from an electrician pal for $24,000 less than what you or I would have had to pay because he could, never mind that the law forbids contractors from plying union leaders with gifts.
>
> Investigators are also concerned whether, a year later, the same contractor did work gratis on Dougherty's home in South Philly.

Now we learn that during the renovation, developer Peter DePaul gave Dougherty a key to a $3,000-a-month unit in the Dockside Luxury Apartments.

Inside the complex - which resembles a cruise ship and boasts of offering "a sea of amenities" - Dougherty had granite countertops, a private terrace, and the use of an indoor pool.

This was a freebie, Dougherty freely acknowledged. Now if it was only clear why he had taken it in the first place.

Home away from home Dougherty referenced his luxury living on a federal financial disclosure form that labor leaders must file.

In 2004, for instance, he received a "holiday gift basket" from the law firm Jennings Sigmond.

"The gift basket," he acknowledged, "was shared with the staff of Local 98."

In 2005, Dougherty reported that his family "occasionally stayed overnight (estimated between 10 and 20 nights) in an apartment of Peter DePaul" at the Dockside.

That answer raises more questions. Which was it, 10 days or 20?

If the stay was really that short, why didn't Dougherty get a hotel room? Surely he knows there's a Hyatt next door to the Dockside. Surely he could have afforded it.

And why, of all his friends, and they are legion, did he take a gift from this one?

DePaul, the developer, later invested in the Foxwoods slots parlor planned for the city's Pennsport section. Dougherty, in addition to his day job as a labor leader and his work with the Redevelopment Authority, is president of the Pennsport Civic Association whose members have serious concerns about the casino.

Informed decisions DePaul [sic] told my colleague Craig McCoy that Dougherty repeatedly had asked to pay for the stay, but that the developer wouldn't hear of it.

I wanted to share Dougherty's side of the story, but he and his staff are refusing to speak to me or any of my colleagues until after the April 22 primary.

Via email, a Dougherty spokesman accused The Inquirer of a "premeditated effort to smear John and damage his electability."

That's unfortunate, because Dougherty wants voters to trust him, yet he doesn't trust voters to review his history and make an informed decision.

Dougherty is happy to be the well-known front-runner, but blinded by the spotlight it brings.

The reality is, of the three Democrats vying for the nomination, only one runs a union that has been repeatedly cited for labor intimidation and Election Day thuggery.

Only one candidate has a long record of politicking and being in the public eye.

Only one is under federal investigation.

Dougherty's campaign motto is "Real change. Real results." It's hard to imagine he'd achieve either in office if he won't even discuss the gifts he has been given, and why.

*Id*. at Exhibit B.

In his complaint, Dougherty averred that the statements in this second April 13, 2008 article were defamatory since they falsely implied that Dougherty "accepted a bribe from Mr. DePaul[, a contractor]. In particular, these statements falsely imply that Mr. DePaul provided Mr. Dougherty with a luxury apartment in exchange for Mr. Dougherty's agreement to use his influence over the Pennsport Civic Association to assist Mr. DePaul with the Foxwoods slots parlor planned for Pennsport." *Id*. at ¶ 22.

The final article was in the editorial section, was published April 17, 2008, and read:

Editorial: A Closer Look at John Dougherty
Which constituents?

John Dougherty has some really good friends.

One unrelated pal, Donald "Gus" Dougherty, allegedly did more than $100,000 worth of work at John's house free.

Another friend, Peter DePaul, a well-connected developer, let Dougherty stay at DePaul's $3,000-a-month waterfront apartment free while Dougherty's home was undergoing a $400,000 renovation.

Federal prosecutors are looking at these relationships as part of a broader probe of the union boss. He has not been charged and denies any wrongdoing. But voters in the first District, where Dougherty is running for state Senate, should take a look as well.

Here are some questions they should be asking: Who else does Dougherty owe? More important, given Dougherty's ties to so many organizations: If elected, whom will he really represent in Harrisburg?

To be sure, Dougherty already wears many hats.

He is head of Local 98 of the International Brotherhood of Electrical Workers, which paid him $182,000 last year and employs one of his daughters.

Dougherty's union started a charter school, the Philadelphia Electrical and Technology Charter High School, where another daughter works as the director of special projects.

He is chairman of the city's Redevelopment Authority, which steers tens of millions in government funding into projects in blighted areas.

Dougherty is also on the board of the Delaware River Port Authority, which has invested millions in area projects.

He is president of the Pennsport Civic Association, where he lives.

Until early this year, Dougherty was on the board of Independence Blue Cross, which is in the process of merging with the state's other insurance giant, Highmark.

If elected, Dougherty may exit some of the posts, but he plans to keep his six figure union job. That alone seems fraught with potential conflicts of interest.

What side will he take on labor issues that come up at the state-owned convention center?

What about the inherent tension between nearby residents and the developer/investors of the two slots parlors planned for the city?

DePaul, who let Dougherty stay at his waterfront pad free, is an investor in the Foxwoods casino planned in Dougherty's Pennsport neighborhood.

Dougherty's union, of course, favors building things because it creates jobs. But many Pennsport residents, and others that Dougherty seeks to represent in the Senate, oppose the casinos.

Dougherty says he is pro-neighborhood and supports the casinos. It's tough to have it both ways.

And if elected, how well would Dougherty work with Mayor Nutter on Philly issues in Harrisburg? Dougherty worked hard to keep Nutter from getting elected last year. In fact, the city ethics board is investigating whether his union was behind a campaign flyer that said a vote for Nutter is a vote for "racial profiling." The bigger question remains: If elected to the state Senate, whom will Dougherty really represent?

*Id*. at Exhibit C.

In his complaint, Dougherty claimed that the statements in this article were defamatory since "they also falsely imply that Mr. Dougherty accepted a bribe from Mr. DePaul. In particular, these statements falsely imply that Mr. DePaul provided Mr. Dougherty with a luxury apartment in exchange for Mr. Dougherty's agreement to use his influence over the Pennsport Civic Association to assist Mr. DePaul with the Foxwoods slots parlor planned for Pennsport." *Id*. at ¶ 25.

On April 27, 2011, the Newspaper filed an answer to the complaint. The lawsuit was stayed due to the bankruptcy filing of the corporate defendant. On October 23, 2012, Dougherty moved to disqualify counsel for the Newspaper, and the motion was denied. The Newspaper filed a motion for summary judgment on December 10, 2012. Dougherty took an appeal from the order denying his motion to disqualify the Newspaper's law firm, and, on February 11, 2014, we reversed based upon a finding that counsel had a conflict of interest. *Dougherty v. Philadelphia Newspapers, LLC*, 85 A.3d 1082 (Pa.Super. 2014).

The trial court re-assumed jurisdiction, and, on April 28, 2014, it granted the Newspaper's motion for summary judgment. The trial court concluded that no statement in any article was capable of defamatory meaning as a matter of law. It ruled that any statement contained in the articles either was true or was an opinion premised upon true facts. The court ruled that the articles in question did not state or imply that Dougherty

committed crimes in the past or would do so in the future. This appeal followed. Dougherty raises the following averments of trial court error:

A. Whether the trial court erred by granting defendants' motion for summary judgment because there are genuine issues of material fact regarding the falsity of the defamatory statements and implications made in the allegedly defamatory publications.

B. Whether the trial court erred in granting defendants' motion for summary judgment because there is a genuine issue of material fact whether defendants' statements at issue are not opinions but are statements which are defamatory in nature or imply defamatory facts and not simply non-actionable opinions.

C. Whether the trial court erred in granting defendants' motion for summary judgment by acting as fact-finder and determining that the FBI Affidavit's allegations were proven facts and thus that no genuine issue of material fact existed regarding the falsity of the defamatory statements and implications made in the allegedly defamatory publications.

D. Whether the trial court erred by holding that statements in the publications at issue were incapable of defamatory meaning.

E. Whether the trial court erred in prematurely granting summary judgment on the basis that plaintiff had failed to prove the defamatory statements were untrue before the relevant discovery had been completed.

Appellant's brief at 3.

Initially, we observe that when this Court reviews the grant of summary judgment, our standard and scope of review are as follows:

Our scope of review is plenary, and our standard of review is the same as that applied by the trial court. Our Supreme Court has stated the applicable standard of review as follows: An appellate court may reverse the entry of a summary judgment only where it finds that the lower court erred in concluding that the matter presented no genuine issue as to any material fact and that it is clear that the moving party was entitled to a

judgment as a matter of law. In making this assessment, we view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. As our inquiry involves solely questions of law, our review is *de novo.*

Thus, our responsibility as an appellate court is to determine whether the record either establishes that the material facts are undisputed or contains insufficient evidence of facts to make out a *prima facie* cause of action, such that there is no issue to be decided by the fact-finder. If there is evidence that would allow a fact-finder to render a verdict in favor of the non-moving party, then summary judgment should be denied.

*Reinoso v. Heritage Warminster SPE LLC*, 108 A.3d 80, 84 (Pa.Super. 2015) (*en banc*).

A cause of action for defamation in this Commonwealth is now codified in § 8343 of The Uniform Single Publication Act, 42 Pa.C.S. §§ 8341-8345, as follows:

**(a) Burden of plaintiff.--**In an action for defamation, the plaintiff has the burden of proving, when the issue is properly raised:

(1) The defamatory character of the communication.

(2) Its publication by the defendant.

(3) Its application to the plaintiff.

(4) The understanding by the recipient of its defamatory meaning.

(5) The understanding by the recipient of it as intended to be applied to the plaintiff.

(6) Special harm resulting to the plaintiff from its publication.

(7) Abuse of a conditionally privileged occasion.

**(b) Burden of defendant.—**In an action for defamation, the defendant has the burden of proving, when the issue is properly raised:

(1) The truth of the defamatory communication.

(2) The privileged character of the occasion on which it was published.

(3) The character of the subject matter of defamatory comment as of public concern.

42 Pa.C.S. § 8343.

While the statute places the burden on a defendant to establish that a defamatory communication is true, the plaintiff bears the burden of proving a statement's falsity in certain circumstances. As this Court clarified in applying United States Supreme Court precedent:

> "If the statement in question bears on a matter of public concern, or the defendant is a member of the media, First Amendment concerns compel the plaintiff to prove, as an additional element, that the alleged defamatory statement is in fact false." *Lewis v. Philadelphia Newspapers, Inc.,* 833 A.2d 185, 191 (Pa.Super. 2003). "If the plaintiff is a public official or public figure, he or she must prove also that the defendant, in publishing the offending statement, acted with actual malice, *i.e.* with knowledge that the statement was false or with reckless disregard of whether it was false or not." *Id.*

*Joseph v. Scranton Times, L.P.*, 89 A.3d 251, 260-61 (Pa.Super. 2014), *appeal granted on other grounds*, 105 A.3d 655 (Pa. 2014); *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767 (1986) (under First

- 12 -

Amendment, if a media article relates to matter of public concern, private plaintiff has burden of proving defamatory statement is false).

The seminal case applying First Amendment protection to newspaper articles that criticize public officials is **New York Times Co. v. Sullivan**, 376 U.S. 254 (1964).  Therein, the New York Times published an editorial advertisement purchased by leaders and supporters of the 1960's civil rights movement.  The editorial advertisement, *inter alia*, outlined violent and oppressive activities undertaken by individuals in Montgomery, Alabama, to suppress the movement as well as wrongful police conduct and criminal actions directed at its leader, Dr. Martin Luther King.  Some of the statements were false.  Sullivan, an elected commissioner of the City of Montgomery, Alabama, brought a civil libel action against the newspaper and people whose names appeared in the editorial.  He averred that the newspaper article implied that he had participated in the responses to Dr. King's protests and was involved in illegal intimidation and violence.  Sullivan obtained a jury award of $500,000.

The United States Supreme Court accepted review of the case to determine if the jury award conflicted with the newspaper's constitutional right to freedom of speech.  It observed: "The general proposition that freedom of expression upon public questions is secured by the First Amendment has long been settled by our decisions," and it concluded that the article in question related to a matter of public concern.  **Id**. at 269.  The

High Court continued that, when a media article is critical of the official conduct of public officials, the First Amendment mandates that the public official prove that the statement was false as well as that the media defendant acted with actual malice in making the statement. The *Sullivan* Court concluded that the evidence presented to the jury therein was insufficient to prove actual malice. It therefore reversed the judgment against the newspaper.

The United States Supreme Court later articulated that a newspaper enjoys *Sullivan* protections in commenting upon candidates for public office. *Monitor Patriot Co. v. Roy*, 401 U.S. 265 (1971). The *Monitor* Court observed that the First Amendment right to free speech was designed to "assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people," and held that it has "its fullest and most urgent application precisely to the conduct of campaigns for political office." *Id*. 272

Of particular import here is the fact that the court, not a jury, has the role of deciding initially whether a statement is capable of defamatory meaning. As we delineated in *Kurowski v. Burroughs*, 994 A.2d 611, 616 (Pa.Super. 2010), "It is the function of the trial court to determine, in the first instance, whether the communication complained of is capable of defamatory meaning. *Rybas v. Wapner,* 311 Pa.Super. 50, 54, 457 A.2d 108, 110 (1983); *Braig v. Field Communications,* 310 Pa.Super. 569, 574

n. 2, 456 A.2d 1366, 1369 n. 2 (1983)." Only if the court determines the existence of a defamatory meaning is the case submitted to a jury. ***Kurowski***, ***supra***; ***see also Baker v. Lafayette College***, 532 A.2d 399, 402 (Pa. 1987) ("In order for a statement to be considered libelous or slanderous, the trial court must, in the first instance, make a determination as to whether the communication complained of can be construed to have the defamatory meaning ascribed to it by the complaining party.").

Dougherty suggests that this long line of cases has been abrogated. Specifically, he maintains that, "The Pennsylvania Supreme Court has made clear that summary judgment in a defamation action, as with other actions, is reserved only for those limited cases where none of the material facts is disputed." Appellant's brief at 18. In this respect, he relies upon ***Weaver v. Lancaster Newspapers, Inc.***, 926 A.2d 899 (Pa. 2007).

In ***Weaver***, the newspaper published a letter by Oscar Brownstein wherein Brownstein reported that Weaver, a public figure, raped a woman and had been arraigned for sexually abusing women and children. Weaver told Brownstein that these accusations were false, that he had not raped anyone, and that he was never arraigned for sexual abuse. Brownstein nevertheless re-published the entire letter, including the accusations in question, on a website. The trial court granted Brownstein summary judgment based upon a finding that there was no proof of actual malice.

Our High Court reversed, ruled that the republication of the purportedly defamatory statements was relevant to actual malice for purposes of the first publication, and held that there were issues of material fact as to whether actual malice existed. It observed that the finding of whether actual malice exists is normally a jury function, even in a defamation case involving a public figure. Thus, the **Weaver** decision explicitly pertained to whether the defendant had actual malice when he published the defamatory remark. **Weaver** decidedly did not alter the law that it is the trial court's function to decide whether a publication is capable of defamatory meaning.

In determining whether a statement is capable of defamatory meaning, the trial court must also ascertain whether the statements constitute opinions. The question of "[w]hether a particular statement constitutes a fact or an opinion is a question of law for the trial court to determine." **Mathias v. Carpenter**, 587 A.2d 1, 3 (Pa.Super. 1991). Hence,

> In determining whether [a publication is] capable of defamatory meaning, a distinct standard is applied [when] the publication is of an opinion. **Veno v. Meredith**, 357 Pa.Super. 85, 515 A.2d 571, 575 (1986), *appeal denied,* 532 Pa. 665, 616 A.2d 986 (1992). "A statement in the form of an opinion is actionable only if it may reasonably be understood to imply the existence of **undisclosed** defamatory facts justifying the opinion. A simple expression of opinion based on disclosed facts is not itself sufficient for an action of defamation." **Id.** (internal citations omitted); **see also Neish v. Beaver Newspapers, Inc.,** 398 Pa.Super. 588, 581 A.2d 619, 622-624 (1990). *appeal*

*denied* 527 Pa. 648, 593 A.2d 421 (1991) (editorial criticizing the way appellant handled his job and suggesting replacing him was an opinion not based on undisclosed defamatory facts and, therefore, was not actionable. The Court found that while the statements in the editorial "might be viewed as annoying and embarrassing, they were not tantamount to defamation.").

***Kurowski***, ***supra*** at 618 (emphasis in original).

This principle is in conformity with Restatement (Second) of Torts § 566, Expression of Opinion. **See *Mathias*, *supra*** (applying § 566). That section provides: "A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion."

The articles in question related that federal authorities were investigating Dougherty for illegally accepting favors from contractors. In them, the Newspaper outlined that the federal inquiry encompassed allegations that Dougherty bought a condominium for less than fair market value from one contractor. That contractor was Donald Dougherty ("Donald"), who is no relation to Dougherty and who owned Dougherty Electric Inc. ("DEI"). The federal inquiry also delved into allegations that Dougherty received free home renovations from Donald. The articles also

maintained that Dougherty accepted a free apartment from a different contractor, Mr. DePaul.[1]

The trial court herein concluded that the contents of the articles were true since Dougherty either admitted to or was under federal investigation for the events in question. Dougherty, on appeal, presents no specific challenge to this finding. He appears to dispute that he was under federal investigation while also maintaining that the federal investigation was not relevant to his argument on appeal. Dougherty's brief at 19 ("Even if, as [the trial court] contends (and Dougherty disputes), there were no disputed issues of fact as to whether Dougherty was under federal investigation, that is beside the point."). Dougherty maintains that the "statements at issue are defamatory for suggesting that Dougherty **actually committed crimes**, not just that he was being investigated." **Id**. (emphasis in original; footnote omitted).

We disagree with Dougherty's positions that the federal investigation is irrelevant herein and that there is a genuine issue of material fact that he was under federal investigation. The articles' statements were derived from

_____

[1] In its motion for summary judgment, the Newspaper established the following. Dougherty filed a financial disclosure form in which he outlined that he stayed rent-free in the apartment provided by Mr. DePaul while renovations were being performed on Dougherty's house; thus, any statements in the articles outlining that event are true. Dougherty was not under federal investigation for that action, and the newspaper did not suggest that he was.

or were opinions premised upon the federal investigation, which is therefore critical to resolution of this matter. The Newspaper presented documents establishing that Dougherty was being investigated for violations of federal law. Kathleen A. O'Hanlon, special agent for the FBI, executed an affidavit in support of a search warrant for Dougherty's home.[2] That fifty-four page

_____

[2] The search warrant and supporting affidavit were initially sealed by the judge who issued the warrant. **United States v. Dougherty**, 2015 WL 574142 (3rd Cir. 2015) (unpublished memorandum). After the federal government initiated its criminal prosecution against Donald, it filed a brief in that action, and the affidavit for the search of Dougherty's home was inadvertently attached to the brief. **Id**. The affidavit was publicly accessible from January 30, 2008, until December 17, 2012 in the Donald Dougherty federal matter. **Id**. The Newspaper filed its motion for summary judgment herein on December 10, 2012, when the affidavit was still publicly available. On December 17, 2012, the federal government's request to have the FBI affidavit removed from Donald Dougherty's file and returned to it was granted. **Id**.

In this lawsuit, Dougherty moved to seal the motion for summary judgment and to strike any mention of the FBI affidavit. On January 2, 2013, the trial court provisionally sealed the motion for summary judgment. When the trial court granted the Newspaper summary judgment, it denied Dougherty's motion to strike the FBI affidavit and unsealed the motion for summary judgment.

On May 1, 2014, Dougherty filed a motion in the federal criminal action against Donald and asked the federal district court for an order declaring the affidavit to be still subject to seal protection and directing that the state court be required to seal the Newspaper's summary judgment motion and any other filed document referencing or attaching the affidavit. **Id**. Dougherty's motion was denied, and the Third Circuit Court of Appeals subsequently affirmed the denial of Dougherty's request. **Id**. Dougherty filed a petition for *writ of certiorari* from the Third Circuit's decision, **John J. Dougherty v. Philadelphia Newspapers LLC, et al.** (U.S. June 11, 2015) (No. 14-1452), and *certiorari* was denied, **Dougherty v.**
*(Footnote Continued Next Page)*

affidavit outlined that Dougherty had been under FBI investigation for his receipt of monetary benefits from Donald, whose company used union workers from Dougherty's union. It is a violation of federal law for union leaders to accept favors from organizations contracting with the leader's union. 29 U.S.C. § 186. The affidavit also stated that Dougherty was being investigated for committing federal income tax evasion and filing false federal tax returns in contravention of 26 U.S.C. §§ 7201, 7206(1).

The affidavit set forth two relevant instances when Dougherty accepted financial favors from Donald. Special Agent O'Hanlon presented detailed information as to why she had probable cause to believe

> JOHN J. DOUGHERTY, Business Manager of the International Brotherhood of Electrical Workers, Local 98, unlawfully received payments of something of value from Donald Dougherty, Jr., owner/operator of Dougherty Electric, Inc. (DEI), an electrical contracting business that employs members of the International Brotherhood of Electrical Workers, Local 98 (hereinafter "IBEW Local 98"). As set forth in detail in this affidavit, JOHN J. DOUGHERTY's 1933 E. Moyamensing Avenue, Philadelphia, PA home was completely renovated by Donald Dougherty, Jr., DEI and Fastrack Construction ("FTC"), a general contractor that subcontracts employee members of IBEW Local 98 and that took over for DEI to complete the renovation work. The renovations were worth more than $400,000. I have probable cause to believe that JOHN J. DOUGHERTY did not pay Donald Dougherty, Jr. and/or DEI for their work and made only partial payment.

Motion for Summary Judgment, 12/10/12, at Exhibit A, Affidavit In Support of a Search Warrant of the Premises Located At 1933 E. Moyamensing

_____
*(Footnote Continued)*
**_Philadelphia Newspapers_**, 2015 WL 3646732, 83 USLW 3915 (October 5, 2015).

Avenue, Philadelphia, Pa, 19148, 11/9/06, at page 1. Special Agent O'Hanlon also provided specifics leading her to acquire probable cause to believe that "JOHN J. DOUGHERTY purchased from Donald Dougherty, Jr. a condominium at 775 E. Allen Drive, Unit 101A, North Wildwood, NJ at below fair market price." *Id*. The FBI concluded that the unit in question had a fair market value of $275,000, based upon a comparison with other units inside the same building, a loan that Dougherty secured to pay for the condominium, and an appraisal of the property obtained by the lender prior to issuing the loan. Dougherty paid Donald $206,000 for the condominium. The affidavit outlined why Special Agent O'Hanlon had probable cause to believe that evidence of crimes would be discovered inside Dougherty's 1933 East Moyamensing Avenue home.

In the record is a summary of an interview that the FBI conducted with Donald. During that interview, Donald claimed that Dougherty paid him $250,000 in cash for the renovation work performed at 1933 East Moyamensing Avenue. Additionally, the certified record contains notes from a May 22, 2006 interview that the FBI conducted of Dougherty, who was questioned about purchasing the condominium for less than fair market value and whether he paid for the renovation work on his home.

A copy of a 100 count indictment returned against Donald by a federal grand jury is attached to the Newspaper's motion for summary judgment. After that indictment was returned, the federal government proceeded with

a criminal prosecution, wherein Donald pled guilty to ninety-nine of those counts. *See United States v. Dougherty*, No. 2-07-CR-00361-001 (ED.Pa. June 26, 2007). The indictment set forth the following. Donald's company, DEI, was a party to a collective bargaining agreement with the "International Brotherhood of Electrical Workers Local 98 ('IBEW Local 98')." Motion for Summary Judgment, 12/10/12, at Exhibit B, Indictment filed in the United States District Court for the Eastern District of Pennsylvania, 6/26/07, against Donald J. Dougherty at page 2, ¶ 2. Donald was accused of making unlawful payments to a union official, specifically "IBEW Local 98 Official #1 [who] was responsible for the management and supervision of the field activities and business office, and for conducting the daily business of IBEW Local 98." *Id*. at page 12, ¶ 2.

The indictment specified the following. Donald sold IBEW Local 98 Official #1 a condominium, which was Unit 101A, Allen Drive, North Wildwood, New Jersey, for $206,000. Prior to the sale, Donald had his employees perform extensive electrical upgrades, which involved use of materials worth between $20,000 and $30,000 and labor costs buried in other electric contracts that DEI was performing at that time. Donald also hired other contractors to install new hardwood flooring and upgrade the kitchen. The appraisal for a loan obtained to purchase the condominium did not include any of this renovation work and indicated that the unit was worth $230,000.

The indictment also accused Donald of "making renovations on IBEW Local 96 Official #1's Moyamensing Avenue rowhouse." *Id*. at page 15, ¶ 2. The document continued that the union official was not invoiced and did not pay for the work performed by Donald until after the union official came under federal investigation. At that point, the union official asked to be invoiced for DEI's work on the home.

Dougherty, who had the burden of proving the falsity of the Newspaper's report about the federal investigation, produced no countervailing evidence. Thus, there is no genuine issue of material fact that Dougherty was investigated by federal authorities for accepting favors from Donald and that Donald was indicted for conferring those favors upon Dougherty.

While Dougherty purports to present five distinct issues, in actuality, his first four averments are identical. Dougherty repeatedly insists that the articles state or imply that he actually was guilty of the criminal acts under investigation. As to the April 13, 2008 editorial, Dougherty argues that it "implies that Dougherty 'accepted valuable favors from a lifelong friend and union colleague,' that federal investigators found incriminating evidence when they searched his home, and that he 'thwarted minorities from gaining high-paying jobs.'" Appellant's brief at 20.

The April 13, 2008 editorial does not suggest or state that Dougherty committed any crime for which he was being investigated. It expressly

stated that Dougherty was similar to Fumo insofar as Fumo was indictable. The editorial then noted that Dougherty denied certain facts. Specifically, the article stated that Dougherty "denies accepting valuable favors from a lifelong friend and union colleague, as outlined in a federal criminal indictment against the friend," and "denies that his leadership has thwarted minorities from gaining high-paying union jobs" and also "denies that the feds found anything incriminating when they searched his home[.]"

Thus, the article expressed an opinion that Dougherty was as indictable as Fumo. Concededly, a portion of the article about Dougherty's denials was sarcastic in tone. Dougherty did deny accepting valuable favors from Donald, he did deny that he prevented minorities from obtaining high paying jobs, and he did deny that the federal government found anything in his home. The sarcasm expressed in the editorial was a reflection of the Newspaper's opinion that Dougherty's denials were not credible.

However, the Newspaper's belief that Dougherty was similar to Fumo at Fumo's indictable worst and the Newspaper's stated skepticism about the truth of Dougherty's denials was firmly premised upon disclosed, true facts. It was true that Dougherty was being investigated by federal authorities and that his house was searched by federal authorities with a warrant supported by an extensive affidavit of probable cause outlining why items incriminatory to Dougherty would be found therein. It was true that a federal criminal indictment had been filed against Donald and that indictment accused

Donald of conferring favors upon Dougherty by selling him a condominium unit for less than fair market value and by performing free renovations on his home. We are aware that the union official to whom Donald gave financial benefits is unnamed in the federal indictment presented against Donald. However, when the indictment is read together with the affidavit of probable cause, it is conclusively established that the unnamed union official was Dougherty.

In light of the documents generated in the federal investigation of Dougherty and Donald, the Newspaper was constitutionally permitted to express its opinion that Dougherty, like Fumo, was indictable. It likewise was free to express its doubt about the veracity of Dougherty's denials that he did not accept favors from Donald, as outlined in the indictment, and that nothing incriminatory was found in his home, which was searched by federal authorities under warrant issued pursuant to the extensive affidavit of probable cause.

An opinion, as noted, is actionable only if it implies an allegation of undisclosed defamatory facts as the basis for the opinion. ***Milkovich v. Lorain Journal Co.,*** 497 U.S. 1, 20 (1990) (under United States Supreme Court precedent, "a statement of opinion relating to matters of public concern which does not contain a **provably false factual connotation** will receive full constitutional protection"). Moreover, of critical importance herein is the fact that the article was an editorial about whether a union

official who was running for political office was a worthy candidate. This context is precisely where the First Amendment right to free speech enjoys its fullest and most urgent application because that amendment is "fashioned to assure the unfettered interchange of ideas for the bringing about of political and social changes desired by the people[.]" ***Monitor Patriot Co.***, ***supra*** at 272 (accusing a candidate for office of being a former bootlegger) (citation omitted). The right to comment on candidates for elections "protects the paramount public interest in a free flow of information to the people concerning public officials, their servants." ***Id***. at 273. Anything that might bear upon a candidate's fitness for office, including private or public matters, and especially any malfeasance or criminal conduct, is fair game for political commentary. ***Id***.

The flippant nature of the April 13th editorial provides Dougherty no relief in the context of political speech. "It is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions." ***Sullivan***, ***supra*** at 269 (citation omitted). Due to our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, . . . . it may well include vehement, **caustic**, and sometimes unpleasantly sharp attacks on government and public officials." ***Id***. at 270 (emphasis added). Given the disclosed and true facts that Dougherty's home was searched by federal officials based upon probable cause and that Donald was under indictment

for conferring two financial benefits upon Dougherty, the Newspaper had the right to express its opinion that Dougherty's denials rang hollow and that he was "indictable."

Regarding the second April 13, 2008 article and the April 17, 2008 editorial, Dougherty avers that he was falsely accused therein of accepting "bribes from a developer and contractor." *Id*. The April 13, 2008 article clearly and unequivocally states that federal authorities were making the accusation. It reported, "In 2003, **according to federal authorities**, [Dougherty] bought a North Wildwood condo from an electrician pal for $24,000 less than what you or I would have had to pay because he could, never mind that the law forbids contractors from plying union leaders with gifts." That article continues, "**Investigators are also concerned** whether, a year later, the same contractor did work gratis on Dougherty's home in South Philly." Thus, the article did not report that Dougherty had been found guilty of violating federal law by paying less than fair market value for a condominium and by receiving free home repairs. In both instances, the article clearly and expressly stated what the federal authorities were **investigating**. At no point did the April 13, 2008 article accuse Dougherty of actually committing the crimes being investigated.

As to the April 17, 2008 article, it reported that Donald "**allegedly** did more than $100,000 worth of work at John's house free." Complaint, 3/23/11, at Exhibit C. Next, the article indicates, "**Federal prosecutors** are

- 27 -

looking at these relationships as part of a broader probe of the union boss. **He has not been charged and denies any wrongdoing**.” *Id*. Rather than implicate Dougherty in committing a crime, that article expressly notes the lack of charges and the denials by Dougherty. The tone of this article is not sarcastic. That document also stated, “Another friend, Peter DePaul, a well-connected developer, let Dougherty Stay at DePaul’s $3,000-a-month waterfront apartment free while Dougherty's home was undergoing a $400,000 renovation.” Dougherty revealed in financial documents that he stayed at DePaul’s apartment without paying rent. Hence, that statement was true.

Dougherty’s second issue on appeal is that the trial court erred in concluding that the statements in the articles that constituted opinions about Dougherty’s fitness for office were opinions based on disclosed and undisputed facts. Dougherty continues that the opinions in the three articles were based upon false and defamatory implied facts rather than disclosed true facts. In this connection, Dougherty repeats his previous assertion that the “articles may reasonably be read to contain or imply untrue statements of fact about Dougherty—that Dougherty had committed crimes (*i.e.* bribery) and will continue to do so in the future.” Appellant’s brief at 22.

As analyzed above, to the extent that the articles mentioned Dougherty taking prohibited financial favors in the form of home renovations and paying less than fair market value for a condominium, they clearly and

unequivocally reported that these were activities for which Dougherty was under investigation by federal authorities and that the federal authorities were the source of the information. The articles never stated that Dougherty actually accepted these unlawful financial favors. The opinions expressed in all the articles, which were that Dougherty was indictable and unsuitable for office, that his denials were not worthy of belief, and that Dougherty was not as worthy a candidate as the other Democrats, were thus based upon disclosed and true facts about the federal investigation into Dougherty and Donald. The trial court therefore properly found that these opinions, in accordance with the above-delineated case authority, were not actionable.

Dougherty's third and fourth positions are repetitions of his single note approach to this matter. In his third issue, Dougherty contends that the trial court erred in failing to appreciate that the article's innuendos were that he was guilty of the crimes under investigation. His fourth allegation is that the trial court erred in concluding that Dougherty failed to demonstrate that the Newspapers' statements were false since "he was never charged with, let alone convicted of, any crime." Appellant's brief at 26. We note that at no point in his brief does Dougherty quote a statement in any article that would constitute an accusation that he actually committed a crime being investigated by the FBI.

Dougherty's final position is that he should have been accorded discovery. Under the law, Dougherty had to establish the falsity of the articles, that they were capable of defamatory meaning, and that the defendant acted with actual malice. The Newspaper provided an affidavit establishing the existence of the federal investigation. The articles did not accuse or imply that Dougherty actually committed any of the acts under investigation. The opinions about Dougherty in the articles were based upon disclosed, true facts. The question of whether the articles were capable of defamatory meaning and whether the opinions were based upon disclosed and true facts were determinations that were firmly vested in the trial court. Discovery would not have impacted upon the legal determination made by the trial court in this matter.

For the foregoing reasons, we affirm the grant of summary judgment.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/14/2015